## THE STEAM DREDGE NO. 1.

### MORRIS & CUMMINGS DREDGING CO. v. NELSON.

(Circuit Court of Appeals, First Circuit.   December 22, 1904.)

#### No. 510.

1. CONTRIBUTORY NEGLIGENCE—RULE IN ADMIRALTY—DIVISION OF DAMAGES.

Libelant, who was rightfully on a dredge as a government inspector of the work, was injured by the breaking of a bitt around which one of the lines used for changing the position of the dredge passed before reaching the winch head, such breaking being the result of the negligence of the man in charge of the winch in failing to throw it out of gear after the dredge had been previously moved, or to see that it was out of gear when the signal was given to turn on the steam again for the purpose of raising the spuds which held the dredge in position while at work; the consequence being that the winch head was revolved before the dredge had been released from her fastenings, and the bitt gave way under the strain put upon the line.  Libelant was seated on the bitt and within the bight of the line which struck him and caused the injury.  While the man operating the winch knew the position of libelant, it did not appear that he had in mind at the time the steam was turned on the fact that the winch was in gear, so as to be chargeable with recklessness or perverseness, or with having acted with a full apprehension of all the conditions.  *Held*, that the negligence of libelant in unnecessarily placing himself within the bight of the hawser, and which continued until the accident occurred, was a concurrent cause of the injury, and that under the rule in admiralty the damages should be divided.

2. SAME.

*Held*, also, that Davies v. Mann, 10 M. & W. 546, has no application to this case.

Appeal from the District Court of the United States for the District of Maine.

George E. Bird (William M. Bradley, on the brief), for appellant.

Benjamin Thompson (William H. Looney, on the brief), for the appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge.   This was a libel brought in the District Court for the District of Maine against Steam Dredge No. 1, a vessel engaged in dredging, under a contract with the United States, in Cape Porpoise Harbor, in the district of Maine, for injuries to William Nelson on the 4th day of September, 1900.   The substance of the allegations of the libel is that at the time of the injury Nelson was employed by the United States, aboard the dredge, as an assistant inspector in regard to improvements then being made at Cape Porpoise Harbor; that as a part of his duties it was necessary for him to observe whether the work was being executed in accordance with the plans and specifications, and, as incidental thereto, to note the shifting of the position of the dredge from time to time; that about 4 o'clock on the afternoon of the day in question he was sitting on a double bitt for the purpose of observing a change then being made; that the quarter line

used in moving the dredge came in over the port quarter, was carried around the forward part of the double bitt on which he was sitting, and then inboard to a steam gypsy; that while the location of the dredge was thus being changed, either by reason of the heavy strain put on the quarter line by the use of the steam gypsy or by reason of the insecure condition or the insufficiency of the bitt, the bitt suddenly broke off at the deck, thereby causing the line to sweep over the front side of the deck, striking Nelson, and throwing him into a scow alongside; that the injury was caused wholly by the negligence of the crew of the barge in subjecting the quarter line to an improper strain, and by reason of the weak and insecure condition of the bitt; and that it was without negligence on the part of Nelson. We will refer again to such of these allegations as are disputed and also are material.

The barge, while at work, was held in position by spuds in the usual way; the outboard end of the quarter line which was used in moving her run out to an anchor, or some other permanent object, and it was kept taut to assist in holding the barge in position. The barge was moved by the use of this and other lines. The inboard end of the quarter line was run over a gypsy head, operated by a steam engine of considerable power. Before putting the gypsy head in gear, it was customary to raise the spuds, so that the dredge could be moved with the assistance of the engine. On this occasion the engine was started before the spuds were raised, with the gypsy head in gear, and the result was that the bitt broke off, as stated in the libel.

The answer alleges that the claimant of the dredge is ignorant for what purpose Nelson was sitting on the bitt. It denies it was necessary for him to sit there in the discharge of his duties. It denies that the injury was caused by the negligence of the crew in subjecting the quarter line to an improper strain, or by the weak and insecure condition of the bitt. It alleges that Nelson was, at the crucial time, in a sitting position on the bitt, facing forward, with his feet and legs on the forward side of the bitt and within the bight of the quarter line. Also, that the breaking of the bitt and the consequent injury of the libelant were not caused by the negligence of any officer or any of the crew of the dredge, or of the owners thereof, but wholly by the negligence of the libelant in assuming an unnecessary position on the dredge, and that he, as a man of long experience as a sailor and inspector, knew the dangers.

It is not questioned that the bitt gave away, and that the cause of its giving away was the starting of the engine while the gypsy was in gear, and before the spuds were raised. Much of the evidence and many of the contentions of the parties relate to one Christiansen, one of the crew of the dredge, whose duty it was to take charge of the raising the spuds and to superintend the lines. The dredge claims that he was ignorant that the gypsy was in gear when the signal for moving was given, and also ignorant of the position of Nelson on the bitt. But the work was in open daylight, under circumstances where there was no difficulty in perceiving and understanding all the conditions in question; so that the issue cannot be cut down to a mere contention as to the personal negligence of any single member of the crew. The case in this particular comes within the well-known presumptions which

were applied by us in Burr v. Knickerbocker Steam Towage Company (C. C. A.) 132 Fed. 248. Likewise we pass by, as not of substantial importance, all criticisms arising from any suggestion that Nelson, at or about the time of the injury, was not actually engaged in his duties as inspector. Such duties required him to be quite constantly aboard the barge, and to pass from time to time, in his discretion, from one part of her deck to another. Of course, there would be intervals when there would be no occasion for him to be actually engaged in any immediate active duty; but his presence aboard and about such parts of the deck as he might reasonably select, even at those times, was proper, and entitled him to protection. The law does not apply to this so fine a rule as to be impracticable.

Neither can it be said that the mere act of leaning against the bitt, or wholly sitting on it, was one of negligence. There is no evidence in the record that there was any reason, arising either from the condition of this particular vessel, or from the customary course of events with reference to happenings in connection with bitts and lines, which would reasonably create any apprehension that in case of an unusual strain this bitt would give way instead of the line. It is common knowledge that it is customary to lean against or sit on the windlass or the bitt, or the rail of a vessel; and yet each, especially the rail under some circumstances, is subject to its own peculiar contingencies. In fact, it is difficult to say what part of a vessel is not at times so subjected; and yet it remains to be shown that a passenger, or other person rightfully aboard a vessel performing duties thereon, is not entitled to be protected in any of these particular positions. For one, however, to take a position in the bight of a line, subject to a strain, is another matter; and to do this may well subject him to criticism as guilty of negligence if injury results to him.

The facts, as understood by the learned judge of the District Court, are so fully detailed in his opinion that we need not touch on them further, except to a very limited extent. We have stated those parts of the case where there are questions of mixed law and fact, or where the topics are so far within the common knowledge that we could apprehend them clearly. As to the substantial questions of mere fact— that is, as to negligence on the part of the libelant so far as that is affected by the claim that he was within the bight of the quarter line— and as to the negligence of those whose duty it was to attend to the movements of the barge with reference to the strain put on the bitt and its giving way, the proofs are contradictory, and, moreover, not entirely clear. The learned judge of the District Court found that those who were at the time managing the barge were guilty of negligence as a matter of fact, and the effect of his other finding is that the libelant had so placed himself within the bight of the line that he, also, was guilty of negligence. He also held that the negligence of those who were maneuvering the barge supervened, so that, consequently, damages could not be divided. We have carefully examined the record, and, while there are unquestionably serious doubts on all the mere questions of fact—whether the libelant, and also whether those in charge of the barge, were each guilty of negligence—yet, under the circumstances stated, we cannot determine that any conclusion we might reach,

different from those reached by the District Court, would be more satisfactory to ourselves, or better supported by the record.

The allegations of the libel, in that it says that the sudden breaking of the bitt caused the quarter line "to sweep over the port side of said deck with tremendous force, striking the libelant, and throwing him" into the scow, gives strong support to the proposition that the libelant was within the bight of the line, although it does not necessarily lead to that conclusion. On the other hand, the proofs in the record that the construction of the parts of the barge involved were of an improved character, and the common knowledge that the bitt would reasonably have been expected to bear even the strain which was improperly put on it, leaves an impression that the injury to the libelant was not a consequence for which the barge, within the contemplation of the law, could be held responsible merely because the gypsy was put or left in gear unseasonably. Yet in this case the bitt consisted of a bedplate of nearly five feet in length, and of good width and thickness. The length of the bedplate was in line with the keel of the barge. From this bedplate came up two uprights, also in line with the keel of the vessel, and braced by a heavy cross-bar extending from one upright to the other. The line was run around the upright which was nearer the gypsy, so it failed to receive the support of both uprights, braced as they were by the cross-bar which we have described. The upright around which the line was run gave way at its base. To the common comprehension this would not have occurred, and in lieu thereof the line would have given way, if it had been run in such a way as to receive the support of both uprights of the double bitt, braced as they were by the cross-bar which we have described. Also other elements suggest themselves which might well have been considered by the District Court, but which are not clearly solved by the record; as, for example, the reasonable probability that the power of the engine of the barge was so great, and its action was so sudden, and the quarter line itself so unyielding, that, whatever might be the reasonable apprehension ordinarily, the reasonable apprehension in this particular case must have been that, where only a single upright was availed of, as was the fact, the bitt would probably give way if anything gave way. However all these things may have been, we cannot, as we have already said, satisfy ourselves that, if we should reverse the conclusions of the District Court on these mere questions of fact, we should reach any new conclusions which could be better supported than those of that court.

It may be said that the District Court did not positively find that the libelant was guilty of negligence in placing himself in the bight of the quarter line. It said that in leaning upon an object within the bight of a rope he assumed a position of some danger; that "as a reasonable man he must have known that in placing himself in such a position he took some chances"; and that he must be charged with the knowledge of the ordinary risk incident thereto. The court also observed that it must be remembered that the libelant was not aware that the gypsy was in gear, and that the hawser would be subjected to the strain to which it was exposed as a consequence thereof; and that, therefore, this was a risk of which he had no knowledge, and which he

cannot be held in law to have assumed. The court also adds later, "It is true that the libelant was guilty of some negligence in sitting within the bight of the hawser." Notwithstanding the libelant was entitled to exercise a liberal discretion as to what parts of the barge he would visit, as we have already explained, yet certainly he could have had no occasion to put himself within the bight of the quarter line; so that, taking all in all, the observations of the District Court must be held to amount to a finding that Nelson was guilty of negligence in this respect. That this negligence was specially contributory follows from the allegation of the libel that Nelson was struck and thrown by the quarter line. That it was of a lesser degree than the negligence of the barge, if it was such, it is settled cannot be taken account of in admiralty, unless the ratio was so overwhelming as to render his negligence trivial. The District Court does not find such to be the fact, nor are we impressed that it was.

The refusal to apportion the damages, and the assessment of the whole on the dredge, are sought to be justified on the strength of the line of cases represented by Davies v. Mann, 10 M. & W. 546, decided in 1842. As we have said, we must adopt the findings of the District Court on questions of mere fact. They show that it was the duty of the dredge, in providing for the safety of all concerned, to take care that when the steam was to be given the engine the spuds should be raised before the gypsy was put in gear, and that the managers of the dredge committed this duty to Christiansen. The findings also show that, if he had properly attended to that duty, he would have thrown the gypsy out of gear, and would have seen to it that it was kept out of gear until the spuds were raised. While the findings were that Christiansen knew that Nelson was in a negligent position, it does not appear that he knew that the gypsy was in gear; or how it happened to be in gear. The presumption is that it was through Christiansen's fault that it was in gear, but there is no presumption that he had in mind at the time the whistle sounded that such was the fact. In other words, whatever negligence Christiansen was charged with, he was not charged with having allowed the engine to be started with a present appreciation of both facts that Nelson was sitting on the bitt and that the gypsy was in gear. If he had had both facts present in his mind, his conduct in allowing the whistle to be blown while the gypsy was in gear might have been so reckless or perverse that it might well be said to have been the sole proximate cause of the injury which resulted. But, for various reasons, Davies v. Mann cannot be held to apply.

Davies v. Mann must be taken in connection with Butterfield v. Forrester, 10 East, 60, decided in 1809, and Tuff v. Warman, 5 C. B. [N. S.] 573, decided in 1858. Of the three, the last-named case must be regarded as the leading one according to Pollock on Torts (6th Ed. 1901) 448, where it is said that those earlier than Tuff v. Warman are now material only as illustrations. In Butterfield v. Forrester Lord Ellenborough said that the fact that a person was on the wrong side of the street would not authorize another purposely to ride up against him. This relates to mere perverseness. He also said some other things, more in line with Davies v. Mann. In Davies v. Mann a donkey left unlawfully in the highway was run down by the defendant driving

a pair of horses. Lord Abinger said, in effect, that the plaintiff could recover, as the defendant might, by proper care, have avoided injuring the animal. The case, however, to which we call especial attention is the one we have already referred to, Tuff v. Warman, decided in 1858, where a barge was run down by a steamer. It was shown that the barge was negligent in not having a lookout. Nevertheless, the steamer saw the barge, but failed to port her helm, as she should have done. It being a common-law suit, the steamer was charged with all damages on the ground that she continued in a course which would inflict an injury, and was therefore liable, although the plaintiff had no lookout. We will have occasion to refer to this case again in a pointed manner. Davies v. Mann, as interpreted and applied in England, is undoubtedly the law of England, as was declared in the House of Lords. Radley v. The London and Northwestern Railway Company, 1 App. Cas. 754, 759. The difficulty, however, of applying Davies v. Mann, even in England, at that late day (1876), is apparent from the fact that there, under the directions of the trial judge, a verdict was allowed to be taken for the defendant, which, on appeal to the Divisional Court, was set aside. The decision of the Divisional Court was reversed in the Exchequer Chamber by such eminent justices as Blackburn, Mellor, Lush, Brett, afterwards Lord Esher, and Archibald. An appeal was then taken to the House of Lords, which reversed the Exchequer Chamber, and restored the judgment of the Divisional Court. Lord Blackburn, who, pending the appeal, had taken a seat in the House of Lords, overruled himself, concurring with the other lords. In that case Lord Penzance, who delivered the opinion in which the other lords briefly concurred, put Davies v. Mann in two different forms. One was (page 759) to the effect that if the defendant, by the exercise of ordinary care, might have avoided the mischief, the plaintiff's negligence would not excuse him; and the other (page 760) described the plaintiff's negligence as "a previous negligence." Therefore it was not a concurring, nor necessarily a contributing, negligence in any sense of either of those expressions.

In view of these varying applications, the observation of Pollock on Torts, at page 449, to the effect that Davies v. Mann has been much discussed in America, though not always wisely so, seems hardly suitable. This is very patent in the light of Sir Frederick Pollock's further observations as to Davies v. Mann. In connection with the discussion of this case, at page 451, he quotes with approval one whom he styles a "learned writer," although anonymous, who undertook to restate the rule of Davies v. Mann as follows: "He who last has an opportunity of avoiding the accident, notwithstanding the negligence of the other, is solely responsible." The same "learned writer" also said that, "If the plaintiff could, by the exercise of ordinary care, have avoided the accident, he cannot recover." He sums up the result of both rules to be that the law looks to the proximate cause, and "holds that person liable who was, in the main, the cause of the injury." As practically applied in England, it may, after all, be well doubted whether this whole line of cases means anything more than to illustrate and emphasize the distinction between causa causans, which the fundamental rules of the law regard, and causa sine qua non, which they do not regard.

As indicated by Pollock, Davies v. Mann is still the subject of discussion in America, except so far as it recognizes the rule of a subsequent, disconnected negligence, or the rule of causa causans, or that of perverseness or persistency, spoken of by Lord Ellenborough. It is in this light that The Inland and Seaboard Coasting Company v. Tolson, 139 U. S. 551, 558, 559, 11 Sup. Ct. 653, 35 L. Ed. 270, is to the implied effect that the negligence of the plaintiff is a defense unless the defendant had knowledge of the position. However, as the appeal at bar is in admiralty, it is not necessary for us to follow the intricacies of Davies v. Mann and its history. We do not know that Davies v. Mann, or any decisions of its kin, was ever cited in a maritime court. Attempts have been made in England to apply this class of cases in admiralty, with contradictory and unsatisfactory results. Marsden's Collisions at Sea (5th Ed.) pp. 16–22. Certain it is that there are decisions of the highest authority in admiralty directly impugning Tuff v. Warman, and dividing the damages under the same substantial circumstances as those of that case, and disregarding any application of Davies v. Mann.

In the Circuit Court of Appeals in the Second Circuit we find The James D. Leary, appearing in the District Court in 110 Fed. 685, and affirmed in 113 Fed. 1019, 51 C. C. A. 620, on the opinion of the District Court. Both vessels involved were steamers—the Leary and the Evelyn. The Evelyn was found at fault for coming to anchor east of the proper anchorage ground, as marked by buoys, but her anchor light was visible to the Leary from one to two miles. The damages were divided. There is no mistaking that this decision absolutely disregarded any rule found in Tuff v. Warman or in Davies v. Mann, although all the substantial circumstances were alike. The same must be said about The Providence, decided by this court, and reported in 98 Fed. 133, 38 C. C. A. 670, where a large Sound steamer, coming into Fall River, was in collision with a schooner at anchor. The schooner was at fault. Nevertheless the opinion observes at page 134, 98 Fed., page 671, 38 C. C. A., that, if the Providence had used proper precautions, the collision might have been avoided, or at least the consequences would not have been serious. Again the damages were divided.

In The America, 92 U. S. 432, 436, 23 L. Ed. 724, one vessel was a tug and the other a ferryboat. The ferryboat struck the tug on the port bow. The court states that the proofs were clear that each vessel was seen by the other in ample season to have prevented the collision, and yet, not only the ferryboat which struck the tug, but the tug, also, was held to half the damages. The New York, 175 U. S. 187, 209, 20 Sup. Ct. 67, 44 L. Ed. 126, is another very marked case. One steamer was in fault for not stopping when the other steamer failed to answer her signals. Both steamers saw each other, and both were held guilty, and damages divided. One of the most striking of all is Atlee v. Packet Company, 21 Wall. 389, 392, 395, 397, 398, 22 L. Ed. 619, in which the circumstances were even more extreme than any which could be deduced from Davies v. Mann, because in Davies v. Mann the object unlawfully left in the public highway was a donkey, only temporarily there, the presence of which might or might not be presumed to be known to travelers. In Atlee v. Packet Company, the object un-

lawfully in the public highway—that is, in the river—was a pier of a permanent character, existing for so long a time that the court found that a skillful pilot was bound to know of it; and yet Atlee, who constructed and maintained the pier, as well as the steamer colliding with it, were both held liable, and the damages were apportioned equally between them. A more positive case is The James Gray v. The John Fraser, 21 How. 184, 191, 16 L. Ed. 106, where the collision was with a vessel anchored in an improper place, without any light; but the other vessel was held in fault for not sighting her, and damages were equally divided. In every one of these cases the circumstances were known to the party who was guilty of the final negligent act. A multitude of other admiralty decisions to the same effect can be cited. Indeed, some of them go so far as to make it clear that the law of these tribunals is not strict with reference even to subsequent, and somewhat independent, disconnected negligences, as is the common law. In view of these propositions and decisions, we are not justified in applying in an admiralty case any peculiar rule which can be deduced, or ever has been deduced, from Davies v. Mann. Moreover, on this appeal it is not clear that one negligence did supervene on the other. It is not even known which party's negligence first originated. Certain it is that both were existing and concurring at the time of the accident. Moreover, as we have shown, it is not proved that Christiansen had an existing appreciation of all the conditions, or was guilty of perverseness. In any view, applying the practical rules of the decisions of the Supreme Court and of the Courts of Appeals which we have cited, neither party to this proceeding can escape the consequence of his own fault.

It may be, in view of the fact that the admiralty is, under no circumstances, as stringent as the common law in refusing to impose liability on one party on account of the contributory negligence of the other, that it need not apply the incidental rules of Davies v. Mann, and the cases akin to it, in any event. Its principal rule being ameliatory, it has no occasion to hold incidental rules too strictly for the purpose of avoiding results which otherwise might shock the common sense as to justice. However this may be, the decree of the District Court must be modified to the extent of requiring a division of damages.

The decree of the District Court is reversed, and the case is remanded to that court, with directions to apportion to each party one-half of the damages and of the interest thereon and one-half of the costs in the District Court, and the appellant recovers its costs of appeal.