SALMEN BRICK & LUMBER CO., Limited, v. DONALD & TAYLOR.

DONALD & TAYLOR v. SALMEN BRICK & LUMBER CO., Limited.

(Circuit Court of Appeals, Fifth Circuit. February 13, 1912. Rehearing Denied March 12, 1912.)

No. 2,224.

SHIPPING (§ 54*)—CHARTER—INJURY TO VESSEL—LIABILITY OF CHARTERER.

Respondent was charterer of a steamship under a time charter which required the owner to provide the winches and winchmen for loading and discharging and the ropes, falls, etc., "necessary to handle ordinary cargo up to three tons in weight." While the vessel was being loaded by stevedores employed by respondent and acting as its agents through their negligence and improper use of the appliances the wire runner leading

---

into a forward hatch became jammed, and when the winchmen, in obedience to their orders, started the winch, the foremast which supported the derrick was broken off by the strain. The forestay, which led forward from said mast over the forward hatches, and which interfered with the loading, had been removed by the master, as he testified, by direction of the stevedores. *Held*, that conceding that the mast would not have broken if the stay had been in place, and that its removal was negligence on the part of the master, such negligence was not a proximate cause of the injury and did not relieve respondent from full liability therefor; it being shown by a preponderance of the evidence that the mast without such support was of ample strength to withstand the strain put upon it by a load several times greater than the three tons impliedly stipulated for in the charter and had previously been so used with safety.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

Maxey, District Judge, dissenting.

Appeal and Cross-Appeal from the District Court of the United States for the Eastern District of Louisiana.

Suit in admiralty by Donald & Taylor, owners of the steamship Santona, against the Salmen Brick & Lumber Company, Limited. Decree for libelants for half damages, and both parties appeal. Reversed on libelants' appeal, and decree for full damages against respondent.

Donald & Taylor, libelants below, owners of the steamship Santona, on May, 1907, chartered her under a time charter to the Salmen Brick & Lumber Company, respondent below and appellant in this court.

Among other things, the charter party provides:

"4. That the charterers shall pay for the use and hire of the said vessel (£1,000) one thousand pounds, British sterling, per calendar month, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a month; hire, to continue until her delivery, with clean holds to the owners (unless lost) at a United States Gulf port."

"22. That the owners are to provide ropes, falls, slings and blocks, necessary to handle ordinary cargo up to three tons (of 2,240 lbs. each) in weight, also lanterns for night work.

"23. Steamer to work night and day if required by charterers, and all steam winches to be at charterers' disposal during loading and discharging, and steamer to provide men to work same both day and night as required. Charterers agree to pay for all night work, at the current local rate."

After the vessel was delivered to the charterers, and while being loaded by the stevedores of the charterers at Gulfport for a voyage to Panama, and on the twelfth day of loading, all the hatches being in use, the ship's foremast fell down, necessitating the rebuilding of the same and resulting in delay in the use of the ship. The owners protested the next day and after notice repaired the foremast at their own expense, and then on demand to the charterers for the cost of the same and pay for the time the ship was delayed, which was refused, filed their libel against the Salmen Brick & Lumber Company, therein alleging the charter party and the delivery of the ship thereunder, and

"Third. That said steamship having been delivered as aforesaid, said company proceeded to have placed on board, through representatives selected and paid by said company and acting for it, a cargo of round pine piling. That in the course of said loading and by the direction of said representatives of said company, the forestay of said vessel, although good, sound, and proper in all respects, was removed. That said representatives of said company, thereafter on August 20, 1907, caused and directed the wire runner leading from winch No. 2 through a pulley on the foremast to be led into hold No. 2, from the starboard side, under two deck beams and over the angle bars

leading fore and aft, and thence to port side and there attached to two pilings, so as to jam said runner in such a manner as to render it impossible to move the same: and said representative of said company caused and directed the winchman at said No. 2 winch (who was so placed that it was impossible for him to see the work of stowing, or the lead of the wire as aforesaid) to apply steam to the winch and to continue the application of steam, thereby placing an unusual and improper and extraordinary strain upon said mast (in spite of being warned of the evidence of strain thereon), until finally said mast broke near the deck of the vessel and fell. Libelant avers that said acts of said representatives of said company were negligent, careless, and improper, and were done for and on behalf of said company.

"Fourth. That the damages to said foremast and to the ship caused by its fall as aforesaid were repaired at the proper and reasonable cost of $1.375, which was paid by the master for the account of the libelant, and libelant was put by said breakage to the further expense of $125.25 for surveyor's fees and expenses in connection therewith, and $50 for Lloyd's agent for inspection and report and $15 notary fees for said surveys and reports and statements in connection with said breakage, making a total of $1,565.25, necessarily paid by libelant on account of said breakage and justly due and owing by said company to libelant with interest at 5 per cent. per annum until paid. Libelant avers that said chartering company declined to have said repairs made, and the same were accordingly made by libelant in order to minimize damages, and were made as promptly and speedily as was possible, and when said loading was completed said ship proceeded on her voyage."

Respondents answered, denying the libel, except as otherwise admitted, and alleged:

"Second. Answering the second article of the libel, respondent avers that the said article is true in part only. It is true that the said steamer was placed at Gulfport, Miss., for the loading of cargo by respondent, but at the time she was so placed to receive cargo, she was not tight, staunch and strong, to the knowledge of libelants and of the master, officers, and crew of said vessel, nor was she fitted for the service required by said charter party, nor was she properly equipped, nor was she manned with a full complement of competent officers, engineers, seamen, and firemen for a vessel of her tonnage, nor was the placing of said vessel at Gulfport, Miss., done in accordance with the duties of libelants under said charter, nor did libelants fulfill all their duties under said charter with respect to maintenance during the continuation of said charter party, all to the knowledge of libelants and of the master and crew of said vessel. The truth is that at the time said vessel was by libelants placed at Gulfport, Miss., the foremast of said vessel was cracked, its construction was weak, and it was not of sufficient strength and stability for the uses and purposes for which it was originally designed and to which it was necessary to put it in the loading of the cargo in the manner contemplated under the charter.

"Third. That the allegations of the third article of the libel are denied, excepting as herein specially admitted. It is true that respondent proceeded to have placed on board, through a representative selected by it and acting for it, a cargo of round piling, and respondent is informed by said representative, and so believes and avers, that all of said work was done in a skillful and proper manner, and that neither the said representative nor any one acting for him or for respondent requested that the stay or support for the foremast of said vessel be removed; but that such removal was improper and done solely upon the volition of the master and officers of said vessel, and not otherwise. That the forestay of said mast was removed by the master, officers, and crew of said ship, when they well knew that this stay and support was absolutely necessary to prevent the coming down of said foremast. Respondent is further informed, and so believes and avers, that an employé of the aforesaid stevedore, representing the respondent company, even called the attention of one of the mates of said ship to the cracked and unsafe condition of the foremast, and was responded to in a rude manner by said officer. That the master of said vessel well knew the defective condition of said mast, but neglected to compel the mate of said vessel to put the aforesaid stay in a position to stay or support said foremast, although he had on more that one occasion directed the mate to do so."

"Seventh. The allegations of the seventh article of the libel are denied. The truth is that because of the aforesaid defective condition of the foremast of said vessel, and because of the neglect of the master and other officers and crew of said vessel to properly stay and support the said mast, causing the said mast to fall down through lack of proper support, respondent was occasioned serious losses, resulting from the falling of said mast and the neglect of the master of said vessel to thereafter provide temporary means for the loading of said vessel. The damages so sustained by this respondent in costs, charges, expenses, and penalties aggregate a sum upwards of $1,446.30, and for the recovery of said sum, respondent herein assumes the position of cross-libelant, and sets out at large and in detail all of said losses and damages in a cross-libel which it hereby expressly reserves the right to file in this cause against the libelants, Donald & Taylor. That respondent has well and truly performed all its obligations in the premises."

And thereupon filed a cross-libel praying for damages for delay and for certain expenses incurred on account of the breaking of the mast.

Thereafter the cross-libel was duly answered, and a supplemental bill filed, and a supplemental cross-libel filed, mainly relating to damages claimed, leaving the issues, however, substantially as charged in the libel and answer.

Evidence was taken and on hearing April, 1910, the court held:

"Libelants allege that the stevedores, respondent's employés, while loading the ship, caused the wire runner leading from winch No. 2 to the end of a derrick to be negligently and improperly led into the hold from the starboard side, then under two deck beams and over the angle bars leading fore and aft, and thence to the port side of the hold, where it was attached to two piles; that this lead was improper and caused the runner to jam; that they then directed the winchman at winch No. 2 to start the winch, and thereby an unusual and improper strain was placed on the mast and it was broken off. Respondents have answered and deny this state of facts, and also set up the contributory negligence of the officers of the ship in removing the forestay from the said mast. They have also filed a cross-libel for damages occasioned them by the delay incident to the repairs. The pleadings are voluminous, and the record exhibits a mass of conflicting and contradictory testimony. I have carefully read and considered all of it, and lack of time and space prevents my commenting upon it more fully.

"But two facts are conceded by both sides: First, that the mast did come down; and, second, that the forestay was not fastened when the mast fell.

"It seems to me that the preponderance of evidence is clearly with the libelants, as to the manner in which the wire runner was led. Common sense should have told any person, with sufficient intelligence to be the foreman of a gang of laborers, that a wire rope led in the manner indicated above would jam, and it was certainly negligence to so handle it. The mast had been undoubtedly weakened by the removal of the forestay and also by the fact that several holes had been improperly drilled in its plates, for the purpose of fastening on the goose neck. Nevertheless, it was sufficiently strong to conduct the loading in the manner in which it was being done, had this unusual strain not been put upon it. The forestay was removed by the officers of the vessel, and that was negligence. This forestay was a wire rope 4¼ inches in circumference. The runner was a wire rope 2¼ inches in circumference. Conceding the former to have been of iron and the latter of steel, still the breaking strain of the stay was at least double that of the runner. It is evident that had the forestay been allowed to remain in place, or had it been transferred to the forward bitts, even though the wire runner had been led in such a manner as to jam, the mast would not have fallen, the result most probably would have been that the winch would have stopped, or, at most, the wire runner would have snapped.

"There is considerable conflict of testimony and contention between counsel as to whose agent the winchman was, and also as to whether the officers of the ship caused the forestay to be removed at the request of the stevedores, to facilitate the loading, or whether they did it of their own volition, to prevent its being chafed. I do not consider either of these questions material. If the winchman ran the winch improperly, he received his orders from the stevedores, who were undoubtedly the employés of respondents. It is certain

the forestay was cast entirely loose and allowed to hang down beside the mast. The officers of the ship ought to have known better than to permit this condition no matter who requested them to allow it.

"I must conclude that the negligence was equal on both sides, and, therefore, the damages should be divided."

And thereupon entered a decree dividing the damages and costs.

From this decree both parties appeal to this court.

John D. Grace and Gustave Lemle, for Salmen Brick & Lumber Co., Limited.

George Denegre, J. P. Blair, and Victor Leovy, for Donald & Taylor.

Before PARDEE and SHELBY, Circuit Judges, and MAXEY, District Judge.

PARDEE, Circuit Judge (after stating the facts as above). From an examination of the evidence, in the light of the argument and briefs of counsel, we concur with the judge of the District Court in holding that the fall of the foremast aboard the Santona was caused through the negligence of the charterers' agents in misusing the appliances of the ship in the manner indicated by the judge's opinion; but we do not find that the negligence of the shipowners proximately, if at all, concurred in or contributed to the falling of the foremast so as to render them responsible for the damage resulting.

Under the charter party and the evidence, the winchman was an employé furnished by the owners of the ship to run the winch under the direction and orders of the charterers and their agents. The evidence does not show that the winchman in and about the falling of the mast was incompetent, disobeyed orders of charterers' agents, or, in any wise except by obeying orders, contributed to the falling of the same. There is nothing, therefore, in the winchman's conduct to adversely affect the shipowners.

The photographs and the evidence of witnesses in the case show that the Santona was a vessel with a foremast and a mainmast; that directly forward of the masts and directly aft were hatches, leading to the hold; and at each hatch double derricks were rigged with proper slings and pulleys for the purpose of hoisting goods into and out of the hold. The derricks were supported in each case by the mast. On the foremast running directly forward was a forestay, which served the purpose of supporting the mast from pressure from forward and was mainly useful to carry the foresail; but there was no backstay supporting the mast from any pressure applied from aft. The inference is strong that the forestay was not intended to support the foremast in using derricks. The forestay was directly over the forehatches, and in case of hoisting any cargo from the side of the ship was so low as to be in the way of the full swing of the derrick, making it necessary for full action that either the stay should be removed or that an extra man should be employed to dip the derrick (or the goods being raised) under the stay if goods were to be lowered through the further side of the hatch into the hold.

There is nothing in the evidence to show that the owners of the ship had any interest in removing the forestay during the loading.

The case does show that it was to the interest of the charterers, and that it would facilitate their business and tend to quicken dispatch to have the stay removed. The evidence is undisputed that on a prior voyage, loading at this same place and at the destination in unloading, the stay was removed at the request of the charterers' agents, and we think that in this case the weight of evidence shows that at the time of the falling of the mast the stay had been removed at the request of the charterers' agents. In the charter party was a provision that the owners were to provide ropes, falls, slings, and blocks necessary to handle ordinary cargo up to three tons, which seems to carry with it as a corollary that the charterers were not to use heavier weights on the derricks in loading the ship than three tons.

Considering that the forestay was not intended in the construction of the ship to support the mast when derricks were used in the loading of the ship through the fore hatches, that all the hatches were in use at the time, that it was to the interest of the charterers that the stay should be removed when the hatches forward of the mast were in use, that under the preponderance of the evidence the stay was removed at the request of the charterers' agents, and that there was an implied guaranty that the mast should not be used in carrying on the derrick a greater weight than three tons, we are clear that the removal of the forestay, while derricks were used in connection with the foremast, was not negligence on the part of the shipowners.

The shipowners contracted that at the time of delivery under the charter party the Santona was seaworthy and to be so maintained; and the respondent alleges that the foremast "was cracked, its construction was weak, and it was not of sufficient strength and stability for the purpose for which it was originally designed and to which it was necessary to put it in the loading of the cargo in the manner contemplated in the charter."

There is no sufficient evidence that the mast, which was of plate metal of about three-eighths inch thickness, was cracked. There was one witness produced by the respondent who testified that he heard a crack while the mast was in use shortly before breaking. To prove that the mast was not of sufficient strength, etc., reliance is placed on the actual break under the use made by the charterers' agents, and that at the particular place of breaking there was a series or row of rivets in a line fifteen-sixteenths of an inch in diameter at various spaces in the circumference of the mast where the upper and lower section of the same were riveted together, and where rivets were also put in to fasten the goose necks attaching the derricks to the mast. Respondents' evidence shows that in the half section forming the forward part of the mast, and at the place where the upper and lower sections were riveted together, there were 14 rivet holes, fifteen-sixteenths of an inch in diameter in a line and at various distances from each other; and the opinion is given that this was faulty construction, because it unnecessarily weakened the mast, and that the rivets should not have been placed in a line, but in at least two rows, or, as one witness called it, "staggered," and that no rivet holes should have been spaced nearer at the very least than $3\frac{1}{2}$ inches from center to

center. These witnesses appear to lose sight of the fact that the rivets fastening together the upper and lower sections of the mast must be placed where the lap is, and that the rivets fastening on the goose necks must be placed where the derricks are to be located on the mast. The section offered in the exhibit, sent up to this court by the respondents and alleged to be similar to the metal plate of the forward part of the mast where it was riveted, shows that out of a circumference of 33 inches, 13⅛ inches are taken up with 14 rivet holes at various distances apart, from 1⅛ inch to 4 inches from center to center, in one place two very close together about $^3/_{16}$ inch and in another three with distance of $^7/_{16}$ inch from hole to hole.

The evidence of libelants' expert as to the fact is as follows:

"The thickness of the plate at the point of fracture was ⅜ of an inch. The forward half of that circumference was weakened by 13 rivet holes of $^{15}/_{16}$ of an inch diameter. It left an area of fractured plate in the forward half of the mast of 7½ square inches of area. That 7½ inches of area, allowing 20 tons per square inch as the average tensile strength of steel, the mast would break with a strain of about 150 tons."

The same witness also testified that the mast was of ordinary construction for vessels of that type, and further as follows:

"Q. Is it a defect in the mast of any kind to have the rivet holes around it in that way? A. No.

"Q. Is it customary in all steamer masts? A. It is customary, yes. Where these holes were, there was a certain amount of re-enforcement equal to the diameter of the holes and loss of material through the rivet holes, by the application of steel pads that made the steps of the derrick.

"Q. You mean the derrick platform? A. The pads—goose necks. The goose necks were riveted on to the mast by means of these holes. That was the object of putting these holes in—to secure the goose necks for the derricks to step into. And these heavy steel castings being riveted on to the mast, exerted a compensation to the mast.

"Q. And it was just above these rivets where the break occurred, just in line with them, was it? A. Just in line with the holes at the top of these pads."

There is some opinion evidence in the record as to the deterioration of a steel mast from using, shaking, seepage, and rust; but it is not very clear nor of convincing effect in this case, where it is shown that the Santona was comparatively a new ship, being at the time of the falling of the foremast not over two years old; and that the foremast fell only through the misuse of appliances.

On consideration of the entire evidence relating thereto, we find that the foremast, at the time in question, was seaworthy within the terms of the charter party.

There is a consensus of opinion, and it is even sworn to, that the foremast would not and could not have fallen through any pressure applied through the winch and derricks if it had been supported by the forestay; and learned proctors for respondent have been urgent in pressing this as showing negligence on the part of the shipowners. The fact may be conceded and, in addition, that the master removed the stay from the foremast on his own motion; and yet, when we consider that the mast unsupported was sufficient for all the rightful purposes of the charterers' agents, as shown by the loading and unloading on the former voyage and the loading commenced and carried on

for 12 days for the second voyage, and that the charterers' agents were fully cognizant of the use of the mast unsupported by the forestay, and that the mast only fell when the charterers' agents without warrant and against the implied stipulations of the twenty-second article of the charter party misused and misapplied the winch and derricks, and thus furnished the real proximate and determinative cause (the causa causans) of the fall of the mast, we are clear the respondents can take nothing from the fact that the foremast would not have fallen if the forestay had been in place. The respondent can be heard to say that the shipowners could have built and supported with stays a mast that with all our misuse and negligence could not have been broken.

These conclusions lead to the reversal of the decree appealed from and the rendition of a decree in favor of the libelants Donald & Taylor and against the respondent Salmen Brick & Lumber Company for the full amount of the proved damages, which were, as shown by the commissioner's report, not disputed as to details, as follows:

| | | |
|---|---:|---:|
| For repairs of mast. | $1,375 00 | |
| Surveyor's fees, etc. | 190 25 | |
| Hire of ship from August 20, 1907, to September 6, 1907, at £1,000 per month. | 2,832 07 | |
| Additional hire withheld and for small breakage. | 1,207 49 | |
| Making a total of. | | $5,604 81 |
| Less deductions agreed upon. | | 418 14 |
| Total damages | | $5,186 67 |

—and interest at 5 per cent. should be allowed on such amount from judicial demand, and for all costs.

And it is so ordered and decreed.

MAXEY, District Judge (dissenting). Under the facts of the case at bar there was negligence on the part of the employés of the charterer and also on the part of the officers of the ship. It is evident to the writer, upon a careful analysis of the testimony, that, but for the concurring negligence of the officers of the ship, the accident would not have happened. Under such circumstances, the damages should be divided. The trial court so held, and in such ruling there was no error. In the judgment of the writer the decree dividing the damages was right and should be affirmed. See The Max Morris, 137 U. S. 1, 11 Sup. Ct. 29, 34 L. Ed. 586; Morris & Cummings Dredging Co. v. Nelson (C. C.) 134 Fed. 161; The Musselcrag (D. C.) 125 Fed. 786.