SCOTTISH NAV. CO., Limited, v. MUNSON S. S. LINE.

MUNSON S. S. LINE v. SCOTTISH NAV. CO., Limited.

District Court, S. D. New York.

Oct. 1, 1924.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Charles R. Hickox and Earl Appleman, both of New York City, of counsel), for Scottish Nav. Co., Limited.

Burlingham, Veeder, Masten & Fearey, of New York City (Roscoe H. Hupper and W. J. Dean, both of New York City, of counsel), for Munson S. S. Line.

WARD, Circuit Judge.

This libel and cross-libel arise out of a charter by the Scottish Navigation Company, Limited (hereinafter called the owners), of their steamer Dunolly, to the Munson Steamship Line (hereinafter called the charterers). The printed form used is entitled "Time Charter, Government Form, approved by the New York Produce Exchange," but the blanks as filled up made the form a voyage charter "for about one round trip * * * charterers to have liberty to sublet the steamer * * * but remaining responsible for the fulfilment of the charter party * * * Steamer to be placed at the disposal of charters at a U. S. port north of Cape Hatteras at charterers' option * * * to be employed in carrying lawful merchandise * * * between safe port and/or ports of U. S. A. and/or * * * West Indies and/or Central America * * * as the charterers or their agents shall direct." It was plainly a voyage charter, no time being specified, though the charter hire, instead of being a lump sum or calculated on the weight or volume of the cargo, was to be paid at $3.25 on the steamer's dead weight capacity semimonthly in advance from the day of her "delivery" until the hour of the day of her "redelivery" in like good order and condition, ordinary wear and tear excepted, to the owners (unless lost) at a United States port north of Cape Hatteras at "charterers' option." Article 4.

As matter of law the charter party was not a demise, Clyde Commercial S. S. Co. v. West India S. S. Co. (C. C. A.) 169 F. 275, cert. denied, 214 U. S. 523, 29 S. Ct. 702, 53 L. Ed. 1067; Dunlop S. S. Co. v. Tweedie Trading Co. (C. C. A.) 178 F. 673; The Volund (C. C. A.) 181 F. 643, 666; Munson S. S. Line v. Glasgow Navigation Co., Ltd. (C. C. A.) 235 F. 64, 67. The owners remained in exclusive possession throughout; the steamer was not delivered to or redelivered by the charterers, and they never had anything but her carrying capacity, with the right to name the ports of loading and discharging until the voyage or voyages ended. Besides, in this case it was as matter of contract, not a demise; article 25 providing: "Nothing herein stated is to be construed as a demise of the steamer to the time charterers. The owners to remain responsible for the navigation of the steamer, insurance, crew and all other matters same as when trading for their own account."

The words "delivery" and "redelivery" in

the printed form do not apply, except in the sense that charter hire begins to run when the carrying capacity of the steamer is put at the charterers' disposal and ends when the voyage or voyages end at a port of the United States north of Cape Hatteras to be named by them. I mention this as an answer to what seems to be a theory of the owners in their libel and in the examination of some of their witnesses, viz. that this provision made the charterers responsible for damage to the steamer, however caused, as if they were in possession as bailees for hire, though in their briefs neither party discussed any such construction of article 4.

The charterers did sublet, and have paid hire only up to December 19, 1920.

Two round voyages were made: The first from Newport News to Prinzapolco, Nicaragua, Central America, to load a cargo of mahogany logs for New Orleans, which she finished discharging December 20; and the second, January 8, 1921, from Mobile with a cargo of steel rails for Port Tanamo, Cuba, after the delivery of which the charterers ordered her to Norfolk, Va., in ballast, where she arrived February 2, 1921, at 9:30 a. m.

The steamer was built in 1901, had a boat deck, bridge deck, and main deck, with two well decks, one between the forecastle and bridge deck and the other between the poop and the bridge deck; four holds, Nos. 1 and 2 forward of the boiler room and Nos. 3 and 4 aft of the engine room; a foremast and topmast between the hatches of holds 1 and 2 and a mainmast and topmast between the hatches of holds 3 and 4. The holds contained many stanchions irregularly placed between the tank top and the main deck. The duty of loading, trimming, and discharging cargo was put expressly by the charter party upon the charterers "under the supervision of the captain." Article 8. The steamer lay a mile beyond the bar in Prinzapolco, in an exposed position in the open sea, and the logs were brought in rafts by tugs to her port side, which was the lee side. The logs were lifted by the steamer's derricks and lowered through the hatches into the holds. When enough were in the hatch, the stevedores stowed them fore and aft throughout the hold, and it was very difficult to move them into the wings because of the stanchions. The heavy rolling sea continued during the whole of the loading, and the logs as they were lifted and lowered and subsequently stowed did considerable damage to the bulwarks, hatch coamings, stanchions, and tank tops. Such damage is usual in loading and discharging logs, but was unusually large in this case because of the continual rolling of the steamer and the obstruction of the stanchions in the holds. The charterers in loading were bound to exercise ordinary care and skill according to the circumstances, and I am satisfied that they did so. Not one word is said in the steamer's log about negligence on the part of the winchmen in running the winches, though the damage was regularly mentioned day by day and always attributed to the rolling of the steamer. So in the extended protest signed on arrival at New Orleans by the master, chief officer, carpenter, and two sailors only the rolling is mentioned as a cause of the damage. Counsel for the owners sought to explain the silence of the log as to any negligence of the stevedores by asking some of the officers whether it was not usual in the log to attribute all damage, however caused, to the weather. If there be such a dishonest custom, which I do not believe, it does not explain the log entries in this case. Its purpose must be to protect owners from liability for damage to cargo, and can hardly extend to depriving them of their right to recover for damage to the vessel resulting from negligence of third parties. Yet now the owners charge the charterers with negligence in running the winches too fast.

It is true there is some testimony that the officers on several occasions complained to the foreman stevedore at Prinzapolco that the winchmen ran the winches too fast, but I do not believe that they would have stood by and tolerated continuous negligence of the winchmen which damaged the steamer. The master would certainly have replaced the stevedore's winchmen from his own crew, as he had the right to do under article 23 of the charter party; there being no evidence of any "rule of the port or of labor unions" preventing the crew from operating the winches. It seems to me that this testimony is a kind of autosuggestion not uncommon nor always conscious on the part of witnesses looking back for some explanation of past events favorable to themselves or to their employers. The conduct of the parties at the time is far more convincing evidence of what took place. Although there may have been occasional objections, the conduct of the officers, the contemporaneous entries in the log, the extended protest at New Orleans, are convincing proofs that the stevedoring as a whole was proper and satisfactory.

The evidence of similar damage in loading and discharging the steel rails is even weak-

er. There is no testimony of any remonstrance by the officers, and the captain says the loading at Mobile was workmanlike, and the second officer, McDonald, says that he saw nothing wrong in the loading and discharging of the steel rails, which was done in the usual manner. I find that the damage was due to the rolling of the sea. The charterers exercised ordinary and reasonable care, and are not responsible.

The principal contest has been made in connection with the buckling forward, on November 24, of the steel mainmast at a point about 16 feet above the main deck and at an angle variously estimated as from 10 to 30 degrees from the perpendicular. The stevedores at the time were hauling a log from the center of No. 3 hatch aft to the port wing of the hold. The entry in the log of this occurrence is as follows: "10:30 A. M. when stowing logs in No. 3 hold carried away mainmast about 16 feet above the deck; lowered derricks down, having to let No. 4 drop, probably damaged it. Cast rigging adrift and let mast come down on top of derricks for safety."

The owners' construction that the charter party warranted the mast for lifts of three tons only seems to me erroneous. They warranted "to keep the steamer in a thoroughly efficient state in hull, machinery and equipment for and during the service." The fact that a derrick was provided by the charterers for lifts of over three tons shows that heavier lifts were contemplated, and the language of article 22 clearly applies to the steamer's gear and not to the mast or standing rigging: "Owner shall provide gear (for all derricks) capable of handling lifts up to three tons and maintain the gear of ship as fitted. * * * All gear for heavier lifts shall be for charterers' account." If the masts were only good for three ton lifts, were the charterers to furnish a new mast and new backstays for lifts over that weight? It is quite incredible that masts are installed on cargo ships for weights of three tons only, in view of the constant practice of loading much heavier weights. In the reported cases cited, where owners have been exonerated and charterers held liable for the collapse of a mast, the charterers' gear was insufficient or broke down first. None of them applies to the charterers in the present case.

In British Maritime Trust, Ltd. v. Munson S. S. Line (D. C.) 149 F. 533, Judge Hough held that the mast was sufficient but collapsed because the preventer stays set up by the charterers, being one of rope and the other of wire, could not take up equal strains, and because the starboard preventer, not having "a straight lead," was a "makeshift."

In Bollman v. Tweedie Trading Co. (D. C.) 150 F. 434, Judge Adams held that the mast collapsed because a bolt in the shoe of a derrick, which the charterers were bound to furnish, broke.

In Bull v. New York & Porto Rico S. S. Co., 167 F. 792, the Circuit Court of Appeals of this circuit held that the mast was sufficient but collapsed because the preventer stays rigged by the master, as agent of the charterers, were of rope and were improperly rigged.

In Salmen Brick & Lumber Co. v. Donald & Taylor, 194 F. 800, the Circuit Court of Appeals, Fifth Circuit, held that the mast was sufficient but collapsed because the charterers' winchman started the winch when the forward fall was jammed.

The steel main mast was secured against side strains by two shrouds on each side running from the hounds at the head of the mast to the deck plates, and against a strain from forward by one backstay on each side a little aft of the shrouds and by a preventer stay running from the hounds to the bitts on the starboard side in the after end of the well deck. Assuming that this method of rigging was proper, what caused the mast to collapse? The strain was from forward, so that only the strength of the mast and the two backstays, which were at but a slight angle from the perpendicular, and the preventer stay, resisted it. The expert testimony convinces me that the columnar strength or power to resist downward pressure of the mast was negligible in connection with this forward strain, and that the strain was on the mast, not as a column, but as a beam supported at each end; also that the backstays, preventer stay, gooseneck in which the cargo beam lay, and the stanchion around which the fall went ought to have gone before a sufficient mast, properly stayed.

The owners' witness, Cousin, who surveyed the mast when it was removed at Glasgow in February, 1918, testified that it was then bent 1¾″ at a point 12 feet from the lower end. Four new plates 12 feet long were put in, so that, allowing 6 inches for the double riveted butts of the new plates, would have extended 23 feet 6 inches from the end of the mast. The mast being stepped 8 feet 6 inchs below the main deck, the top of the new plate would have been 15 feet above the main deck; that is, 1 foot below the point where the old plate buckled.

Cousin says the plates were $\frac{7}{20}''$ thick, and the owners' expert, Buchanan, who examined the mast at New Orleans, testified that they should have been originally $\frac{5}{16}''$ to $\frac{3}{8}''$ thick, and that they were reduced by corrosion at the place of fracture to about $\frac{1}{4}''$.

Wilson, also called by the owners, who surveyed the damage at the same time, testified that the plate at the fracture was "$\frac{1}{4}''$ full, just a shade full." As the plates were originally $\frac{7}{20}''$ thick, this shows a reduction by corrosion at the point of buckling of $\frac{1}{10}''$

◼ The characters have offered in evidence a piece of steel said to have been cut from the mast at the point of buckling. It shows no fracture nor any signs of paint on the outside, nor any evidence of curvature nor of the other plate into which the two rivets whose heads appear must have been sunk. Moreover, the man who cut it has not been produced as a witness, nor any one who delivered it to, or who received it for, the charterers. All I can say is that I think the exhibit not sufficiently proved, and it is therefore excluded.

◼◼ This leaves us with only the testimony of the surveyors, at Glasgow and New Orleans, and of the experts examined at the trial. As it was the owners' equipment which broke down, the burden lies upon them to prove that it was sufficient. It has been constantly held that failure to keep and to produce such broken equipment creates a presumption that production of it would not be favorable. The Phœnix (D. C.) 34 F. 760; The Lackawanna (C. C. A.) 210 F. 262; The Bertha F. Walker (C. C. A.) 220 F. 667; The Colon (D. C.) 241 F. 592; Id. (C. C. A.) 249 F. 460; The Bolton Castle (C. C. A.) 250 F. 403; Clyde Lighterage Co. v. Penna. R. R. Co. (C. C. A.) 258 F. 116.

◼ It seems to me that lowering the mast on the steamer after the accident to a position parallel with the deck would hardly have failed to increase any existing fracture and to create new fractures; as would also be the case in unshipping the mast at New Orleans and burning it out on deck. The extent and location of the buckling and of any fracture or fractures and its distance from the nearest double riveted butt straps, as well as the character and condition of the steel, could then have been positively fixed. Better evidence could have been produced by the owners than the charterers' exhibit, which I have excluded as not proved. I find that the mast collapsed because it was insufficient in the rolling sea and not because of any negligence upon the part of the winchmen in overtaxing it.

◼ The above are the material contentions, but there are others, minor and incidental. October 20, at 2:15 p. m., the steamer's carrying capacity was put at the disposal of the charterers at Newport News, but they occupied time between October 22 at 4 p. m., and 23 at 10 a. m., in furnishing a derrick for loads over three tons, for which they deducted $437.37 from the first installment of charter hire, I suppose, under article 15 as "loss of time from * * * or by any other cause preventing the full working of the vessel." But under article 22 the charterers and not the owners were obliged to furnish gear for loads over three tons; gear for heavier loads being "for charterers' account," I find that the loss of time is due to the charterers and that the deduction was not proper. In order to put the whole reach of the hold at the disposal of the charterers, the master on the voyage to Prinzapolco took down a wooden bulkhead between the cross bunker and No. 2 hold, but the crew were not competent to replace it, and he was at the expense of doing so on the termination of the charter. The only evidence is that holds Nos. 1 and 2 were not completely filled, and, if taking down this cross bunker did facilitate the actual loading, I think the owners are entitled to recover the expense of replacing it.

◼ As the voyage from Mobile to Tanamo was performed, the owners are entitled to recover charter hire, but, on the other hand, the charterers are entitled to recover the loss and any expense they sustained as the result of their not having been given the full carrying capacity of the steamer on the voyage from Prinzapolco to New Orleans, subject to such incidental credits as should be allowed to either party. The usual interlocutory decree may now be entered, and, when the balance which one of the parties is entitled to recover has been fixed, a final decree will be entered in favor of that party, with one bill of costs, and the pleading of the other party will be dismissed.