## THE EXPLORER.[1]

(*Circuit Court, E. D. Louisiana.* April 11, 1884.)

MARINE TORT—DAMAGES.
In the case of marine torts it is the rule of the courts of admiralty to exercise a conscientious discretion, and give or withhold damages upon enlarged principles of justice and equity. A party who is *in delicto* ought to make a strong case to entitle himself to general relief.

Admiralty Appeal.
*James R. Beckwith*, for libelant.
*Henry C. Miller*, for claimant.
PARDEE, J. On February 8, 1882, the libelant, Thomas McGrath, while descending the main hatchway of the steam-ship Explorer, had his left arm caught in the wheels of a revolving steam-winch, break-

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

ing the bones and tearing off the muscle, resulting in great suffering and in permanently disabling the arm. At the time the steam-ship Explorer lay in the Mississippi river, her bow up the stream, at her wharf in the city of New Orleans, taking on cargo for Liverpool. McGrath was employed as one of a gang of screwmen under the direction of a stevedore engaged in storing cargo in the ship. His duties were in that part of the hold under and reached by the main hatchway. There was near to and forward of the main hatchway a steam-hoisting winch used for taking on and lowering the cargo down the said main hatchway. The barrel or winding shaft of this winch extended in a direction across or athwart the ship, and the gear-wheels at right angles with the barrel or winding shaft revolved fore and aft. From the middle of the forward coaming or frame-work around the hatchway, a ladder extended down into the hold, used by those employed on the ship to reach the hold. The winch was in use taking on cargo, and its gear-wheels revolving, and this use was constant except at short intermissions; the winch was put in motion or stopped by the man stationed at the lever or crank, who stood in the rear of the wheels, facing aft, and on notification to that man the movement of the winch and wheels could be stopped or stayed while any one was in the act of passing between the coaming of the hatchway and the winch and down the ladder to go below. It was during one of these intermissions of working the winch that McGrath started from the port or outer side of the ship to go to this ladder and descend into the hold. He gave no signal, directly or through any one, to the man at the winch not to put it in motion. The man in charge of the winch being ignorant of McGrath's purpose to go below, the winch was put in motion while he was proceeding to or had reached this ladder, and his left arm was caught or drawn between the revolving wheels of the winch and thereby seriously injured as aforesaid.

The winch and the wheels were near to the coaming around the main hatchway, how near the evidence is uncertain, but there was a space between the wheels and other parts of the winch and the frame or coaming of the hatchway, and in that space it was practicable, with care and precaution, for one to pass in safety to the ladder and go below, although the winch might be in motion. The weight of evidence is that the winch was not nearer the main hatchway than is usual on steam-ships. Although housing or covering of the cog-wheels of the winch was provided, and on board of the ship, no housing or covering was on or over the winch, as is usual and necessary when in use; but after the accident, by direction of the master of the ship, the covering was put on. It does not appear that the stevedore or any of his men knew that housing was provided, or where it was stowed aboard ship. McGrath had no occasion of duty or employment to be on deck; his duty was in the main hold. There was a safer, though a more roundabout way of reaching the main

hold, than the ladder down the main hatchway. This was by the forward hatchway, which, (although in use for hoisting cargo,) by reason of the distance between decks, required no ladder. McGrath knew, when he accepted employment on the ship, of the location of the winch and of the proximity of the wheels to the main hatchway, and of the danger in using the ladder to go below while using the steam-winch. He also knew, or ought to have known, when he started down the ladder that in the business of hoisting in cargo the winch, though stopped for the moment, was liable to be started at any moment. McGrath's injuries were such as to confine him in the hospital under care of the surgeon 40 days, and his arm is left permanently crippled, unfitting him from pursuing his occupation as a screwman, although in other and lighter occupations he will be able to earn a living. Forty dollars entrance fee to the hospital was paid. As a screwman, during the season McGrath earned seven dollars per day.

From this statement of the facts, shown by the evidence, it seems clear that there was fault in not having the housing over the machinery of the winch. Such housing is usual, was provided by the ship, and all the witnesses agree that if it had been on, the injury to McGrath would not have happened.

Some effort is made to throw the responsibility for failure to have the housing on, from the ship and its officers, to the stevedore and his foreman. It is urged that the ship had provided the housing and had it aboard, ready for use, that the loading was turned over to the stevedore and his men, over whom the officers of the ship had no control; that they had the machinery of the ship to use, and did use it in their own way, and if they used it carelessly, and through negligence injured one of themelves, the ship ought not to be held responsible. Perhaps if this were all true, the ship could escape responsibility, but it does not appear that the stevedore had the entire control of the machinery and of the loading of the ship, nor that the housing was furnished, or its presence on the ship known, to him or his men. Besides, the ship furnished the machinery and should have furnished it complete, and while the owners may not have been in fault, as the housing was provided and aboard the ship, their servant, the master, was in fault in not producing it and seeing that it was used. The alacrity with which it was produced and used after the accident shows what was the original duty of the master. It seems to be clear from the evidence that the libelant contributed by his negligence, want of care and precaution, to bring about the accident which resulted in his injury. Neither his duty nor his employment called him on deck. According to several witnesses, if he had been where his employment required, he would not have been injured. He knew the danger in attempting to go down the hatchway when the winch was in motion; he knew that, if not at the time ac-

tually in motion, it was only stopped temporarily, and was subject to be started at any moment, and he failed to give any notice or warning to the person in charge of the winch, of his purpose to go down the hatch and ladder, when, as appears by the evidence, the giving of such notice was usual and customary. If, as ordinary prudence required, he had given the notice, no accident would have occurred. As both the ship and libelant were in fault, the case made is one of contributory negligence. At the common-law, the injured party whose negligence has directly contributed to the injury cannot recover damages. See Sedg. Dam. (6th Ed.) p. 573, side page 468 *et seq.;* Moak, Und. Torts, rule 27, p. 289 *et seq.*, and the cases there cited; and see *Railroad Co.* v. *Houston,* 95 U. S. 697. The same principle was held in the civil law. Inst. lib. 4, iii., 7.

In Louisiana the supreme court by Justice MANNING says: "The doctrine of contributory negligence is now imbedded in our jurisprudence, and is recognized and applied in all the states and by the national courts." *Murray* v. *R. Co.* 31 La. Ann. 490, and any number of Louisiana authorities might be cited in support.

But it is claimed that a different rule prevails in the admiralty. In cases of collision of vessels it is well settled. See *The Catherine,* 17 How. 170, in which case it is said: "Under circumstances attending these disasters, in case of mutual fault, we think the rule dividing the loss the most just and equitable, and as best tending to induce care and vigilance on both sides in navigation." For the English rule in admiralty to same effect, see Abb. Shipp. 232; Macl. Shipp. 305, and it seems that now, by act of parliament, the admiralty rule is to prevail in regard to such cases in all of the divisions of the high court. Macl. 311. In the black book of admiralty it will be found that nearly all the old Codes provided for a division of damages in cases of collision by mutual fault or inevitable accident, for the reason that "an old ship places itself willingly in the way of a better ship to strike the other ship if it should have all its damages, but when it knows that it must share the damages in moieties it places itself willingly out of the way." In prize cases also the doctrine of the common and civil law as to contributory negligence does not apply. 1 Kent, Comm. 156, citing *The Marianna Flora,* 11 Wheat. 54, in which case, which was one of prize, Mr. Justice STORY says: "The present case stands upon a strong analogy, and to inflict damages would be to desert the analogy. Even in cases of marine torts, independent of prize, courts of admiralty are in the habit of giving or withholding damages upon enlarged principles of justice and equity, and have not circumscribed themselves within the positive boundaries of mere municipal law. They have exercised a conscientious discretion on the subject. A party who is *in delicto* ought to make a strong case to entitle himself to general relief." Again, in the case of *The Palmyra,* 12 Wheat. 1, Mr. Justice STORY says: "In the admiralty the

award of damages always rests in the sound discretion of the court, under all the circumstances." And in each case he cites Lord Stowell in *The Le Louis*, 2 Dod. 210.

From the examination I have been able to make of text books and admiralty reports, I do not find that outside of collision and prize cases, the admiralty courts have claimed or exercised a different rule as to cases of contributory, concurrent, or comparative negligence from that applied generally in courts of law and equity, in cases of damage and torts committed or suffered on land. It is true that as to mariners who are injured, no matter how, in the line of their duty aboard ship, certain responsibilities as to care, attention, wages, etc., devolve upon the ship; but I have not been able to find a case where a seaman, freighter, or passenger, injured through his own negligence, has been allowed to recover damages outside of care and attendance from the ship or her owners. I notice that in the case of *Leathers* v. *Blessing*, 105 U. S. 626, it was specifically found as a fact "that libelant was in no manner negligent or in fault whereby he contributed to his said injury." And in *Sunney* v. *Holt*, 15 Fed. Rep. 880, which was a case where a deck hand on a boat fell through an open hatchway, the court said: "One who, by his own negligence, has brought injury upon himself, cannot recover damages for it." In the eastern circuits I find that as against landsmen employed in port to load ships, the courts of admiralty apply the common-law doctrines as to contributory negligence and as to the negligence of fellow employes. See *The Victoria*, 13 Fed. Rep. 43; *Dwyer* v. *Nat. Steam-ship Co.* 17 Blatchf. 472; S. C. 4 Fed. Rep. 493; *The Germania*, 9 Ben. 356. However, from all the authorities examined, I am disposed to hold that in cases of marine torts it is the rule of the courts of admiralty to exercise "a conscientious discretion and give or withhold damages upon enlarged principles of justice and equity."

Applying this rule to this case, in justice and equity what damages should be given to or withheld from libelant? Justice Story, in *The Marianna Flora, supra*, in declaring the admiralty rule, said: "A party who is *in delicto* ought to make a strong case to entitle himself to general relief." Libelant's negligence is so apparent and led so directly to his injury that he does not make a strong case except in the extent of his suffering and the permanency of his injury. "The rule which denies relief to a plaintiff guilty of contributory negligence is based less upon considerations of what is just to the defendant, than upon grounds of public policy which require, in the interest of the whole community, that every one should take such care of himself as can reasonably be expected of him. It is a part of the same policy which regards suicide as a crime, and which punishes vagrancy and idleness." Shear. & R. Neg. (2d Ed.) § 42. "Both being guilty of negligence, they are the common authors of what immediately flowed from it, and it was not a consequence of the negligence of either. The court cannot accurately and will not undertake to dis-

criminate between them as to the extent of the negligence of each and the share of the result produced by each." Moak. Und. Torts, 280. These considerations of general application in the law courts of the land lose no force in determining what justice and equity require in the admiralty courts. From which it is easy to see that, while the negligence of the libelant cuts him off from the right to compensation, the negligence of the respondent does not stand excused. Which may be taken to mean that the libelant can recover nothing as compensation, and that the respondent or claimant in this case shall pay the expenses.

Libelant was laid up in the hospital 40 days, and thereby lost that many days' work, which at that season was proved to have been worth $7 per day in his occupation as a screwman, amounting to say $280. There is ño evidence as to surgeon's fees, or medicines, or nursing, except that $40 was paid for libelant's admission to the hospital, making with the labor lost the sum of $320. This amount with the costs of this case will be decreed against the claimant as the ship's share of the expenses resulting from an injury to which the ship contributed through the negligence of her master and officers. To allow the libelant more would be to compensate and reward negligence, and in my opinion would not be in accordance with the exercise of a conscientious discretion, in applying enlarged principles of justice and equity. It would approach very near to judicial liberality. Under the evidence in the case the libelant is not so badly injured but what he can earn support for himself and family, and there is nothing in evidence to show that either is likely to become a burden on the community, so that there is no reason to mulct the ship in the interest of the general public.

A decree will be entered for libelant for the sum of $320 and costs.