THE S. S. SAMOVAR.

No. 23891–R.

District Court, N. D. California, S. D.
April 24, 1947.

576

[This page is almost entirely redacted with black bars obscuring all body text. Only the page number "577" is visible in the top right corner.]

Melvin M. Belli, of San Francisco, Cal., for libelant.

Frank J. Hennessy, U. S. Atty., and William E. Licking, Asst. U. S. Atty., both of San Francisco, Cal., for respondent United States.

Thelen, Marrin, Johnson & Bridges and Bruce Walkup, all of San Francisco, Cal., for respondent Permanente Metals Corporation.

Lillick, Geary, Olson & Charles and Edwin L. Gerhardt, all of San Francisco, Cal., for claimant British Ministry of War Transport.

John H. Black and Edward R. Kay, both of San Francisco, Cal., for impleaded respondent Luckenbach S. S. Co., Inc.

MATHES, District Judge.

Libelant, a longshoreman, filed his libel in rem and personam against the steamship Samovar, the Permanente Metals Corporation, as builder, and the United States of America, as owner, seeking damages for injuries suffered while engaged in stevedoring work aboard the vessel.

A claim to compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., was also filed by libelant, but he has elected, pursuant to § 33 of that Act, 33 U.S.C.A. § 933, to proceed against third persons.

Following issuance of process and seizure of the Samovar, libelant filed his first amended libel in rem and personam alleging in substance that his injuries proximately resulted from negligent construction of the vessel, which caused a "pad eye" welded to the after-end bulkhead of No. 2

hatch to carry away with attached gear and strike the libelant on the head, arm and body.

For a second cause of action libelant alleges that a proximate cause of his injuries was the maintenance and operation of the vessel and its gear in an unseaworthy condition in the particulars just described. A third cause of action charges that libelant's injuries proximately resulted from negligence of the United States as owner in maintaining the Samovar and its gear in an unseaworthy condition.

The British Ministry of War Transport, representing His Majesty's Government in the United Kingdom of Great Britain and Northern Ireland, appeared as claimant of the vessel alleging that "the S. S. Samovar is a steamer owned by the United States Government, and at all times mentioned in the libel was under bareboat charter to His Majesty's Government in the United Kingdom." The British Ministry also denied most of the material allegations of the libel and alleged contributory negligence and assumption of risk on the part of the libelant.

The United States answered denying "that libelant is entitled to sue this respondent under the Suits in Admiralty Act or otherwise or at all."

In response to exceptions filed by the Permanente Metals Corporation, libelant amended the first amended libel upon its face. Permanente thereupon answered and was granted leave to file a petition bringing in the United States as third party respondent pursuant to Admiralty Rule 56, 28 U.S.C.A. following section 723. This petition asserts a claim to indemnity, alleging that in the contract for construction of the Samovar the United States, acting through the Maritime Commission, agreed to reimburse Permanente for all sums the builder might be required to pay by reason of claims such as that asserted by libelant here.

The United States excepted to the Permanente petition urging that inasmuch as a shipbuilding contract is not maritime in character, any claim thereunder is not properly cognizable in admiralty; and

further, that the United States has not consented to be sued in this court on claims in excess of $10,000 which arise under contract, 28 U.S.C.A. § 41(20). These exceptions were overruled, and the Government answered praying that the petition be dismissed for want of jurisdiction "under the Suits in Admiralty Act, 1920, the Public Vessels Act, 1925, or otherwise."

Permanente then filed an amendment to its answer to the libel as amended. An amended answer was also filed by the United States, again denying the jurisdiction of this court.

Thereafter the Government filed a petition impleading libelant's employer, Luckenbach Steamship Company, as third party respondent pursuant to Admiralty Rule 56. This petition alleges that at all times mentioned in the libel there was in force a contract between Luckenbach and the United States, acting through the War Shipping Administration, whereby Luckenbach "agreed to furnish and perform the necessary services and labor for loading and stevedoring certain vessels (including the 'Samovar') and to indemnify and save harmless the United States against all loss or damage in connection therewith." Luckenbach answered the petition denying negligence and the right of the United States to indemnity or other remedy over against Luckenbach.

At the opening of the trial the Government moved to dismiss the libel and the impleading petition of Permanente, asserting want of consent of the sovereign to be sued in this court. Thereupon, pursuant to leave of court, libelant again amended the first amended libel upon its face to allege consent of the United States Government to be sued under both the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., and the Public Vessels Act, 46 U.S.C.A. § 781 et seq. Permanente also received leave to amend in like manner its petition impleading the Government.

The British Ministry of War Transport and Permanente were permitted to file separate petitions impleading libelant's employer, and Luckenbach in turn was granted leave to file formal exceptions and answers thereto after the close of the evidence. It

was then stipulated that the petitions and answers, and any exceptions thereto, would be deemed to have been filed in advance of the trial and a ruling on the exceptions reserved.

Thus the cause proceeded to trial upon the issues of fact and law raised by (1) the first amended libel, as twice amended upon its face, the answer of the British Ministry, the answer and amendment to answer of Permanente, the amended answer of the United States, and the answer of Luckenbach; (2) the impleading petition of Permanente with amendment, and the answer of the United States and Luckenbach thereto; (3) the impleading petition of the United States and the answer of Luckenbach thereto; and (4) the impleading petitions of the British Ministry and Permanente, and the answers and exceptions of Luckenbach thereto.

The Facts

The facts, either admitted by the pleadings or established by the evidence, are briefly: The vessel involved is one of many so-called Liberty freighters which the Permanente Metals Corporation constructed for the United States Maritime Commission during World War II. While under construction the ship was known as Hull No. 1713, and was built according to plans and specifications of the Maritime Commission. Both Permanente and the Commission surveyed and inspected the vessel in the course of construction and upon completion.

By July 30, 1943, Hull No. 1713, now christened the S. S. Frank D. Phinney, was completed. On or prior to that date the ship had passed the inspection not only of the builder and the Maritime Commission, but also of the Bureau of Marine Inspection and Navigation of the United States Coast Guard, the American Bureau of Shipping, and the British Ministry of War Transport for whose service she was destined pursuant to charter party arrangements under lend-lease between the United States Government and His Majesty's Government in the United Kingdom.

On July 30, 1943, the Frank D. Phinney was delivered by Permanente, accepted by the Maritime Commission, and delivered at once by the Commission to the War Shipping Administration. The latter agency in turn immediately delivered the vessel to the British Ministry, as bareboat charterer, with fuel, water, stores and equipment on board. The ship was then given "provisional" British registry and her name changed to S. S. Samovar. On the same day she was moved to Oakland, California, and berthed with port side lying into Market Street Pier, preparatory to loading lend-lease cargo for her first voyage.

Loading was commenced on August 4, 1943. The stevedoring service was furnished by the War Shipping Administration under lend-lease agreements, the work being done by impleaded respondent Luckenbach pursuant to a general stevedoring contract entered into on January 1, 1943. The cargo consisted of truck chassis, airplane engines, tires and other material consigned to Egypt and the Middle East for use by the Royal Air Force.

Libelant was one of a crew of longshoremen employed by Luckenbach to load wooden cases containing truck chassis into No. 2 hold. These cases were approximately 4 feet wide, 6 feet high and 18 feet long, and weighed about 5 tons.

The forward and after bulkheads of lower No. 2 hold were equipped with "pad eyes"—steel rings, 7/8 inch thick with an inside diameter of 5 inches, secured to the bulkhead by means of a 7/8 inch thick steel staple or "U" bolt, each end of which was welded to the face of the bulkhead by a butt-fillet weld. The length of the staple was such, that when welded in place, there was a 7¼ inch space between the surface of the bulkhead and the inside edge at the middle of the bend of the staple.

On each bulkhead there were four such "pad eyes" or "cargo lashing rings", two port and two starboard. One of each pair was placed approximately 5 feet and the other 15 feet above the tank top or bottom of the hold, and about 6 feet in from the ship's side. In lower No. 2 hold the space between the tank top and the underside of the lower deck was approximately 24 feet.

No other fittings or equipment for handling cargo were on the bulkheads. Along the ship's sides the ribs or frames were spaced 30 inches apart, and in lower No. 2 hold four cargo lashing rings were attached to the frames, port and starboard. Large "U" bolts were also welded to the heel of the frames at various points, "for the compound purpose of lashing cargo and helping to take cargo to the side wings."

Late in the afternoon of August 5, 1943, the stevedore gang, of which libelant was a member, had finished the work of stowing one complete row or tier of the cases on the tank top of lower No. 2 hold, and were engaged in moving the first case of the second tier into position in the after end of the starboard wing.

In this operation winches in low or double gear were the source of power. The port and starboard midships booms were being used. In lower No. 2 hold, one snatch block was shackled into the ring of the upper starboard "pad eye" or "cargo lashing ring" on the after bulkhead by means of a regular ship's shackle or clevis. Another snatch block was secured to the frame on the starboard side by means of a clamp fastened to a channel flange. A bull line or wire cable led through one of the snatch blocks around one side and end of the case, thence through the other snatch block. A fall from each of the booms led along the coaming down into the hold, and was attached to either end of the bull line.

The gear was rigged in the same manner as was customarily used in the circumstances. Indeed it was the identical rigging which had been used earlier that day and the day previously in stowing the first tier of cases of similar size and weight in lower No. 2 hold. The case in question was thus rigged for the purpose of "schoonering" or "bullying" or "snaking" it on skids of rough lumber or dunnage into the extreme starboard wing, so that one side of the case would lay against the starboard side of the hold with one end against the after bulkhead.

Libelant was not the foreman, but was a key man of the gang and had some 20 years experience as a longshoreman. One of libelant's duties was to watch for signals from the foreman in the wing and stand at or move to a position in the square of the hatch where he could immediately communicate the foreman's orders to winch operators on deck above. Because of the noise made by the winches while in operation, it is necessary to signal such orders by means of hand and arm movements well understood among stevedores.

On the occasion in question libelant was standing in lower No. 2 hold in the middle of the square of the hatch behind a midship stanchion and ladder. His foreman was standing on top of the moving case directing the operation. As the case was thus being moved into place, it began an end-around movement. The foreman signaled libelant to signal the winches. Libelant then moved from his place of safety behind the stanchion so the winch operator could see his signal. At that moment the "pad eye" or "cargo lashing ring" carried away from the bulkhead and the snatch block, ring and staple flew through the air and struck libelant, inflicting the injuries for which he seeks damages here.

Although the opinions of welding experts varied as to details, all were virtually unanimous in declaring that one or both of the welds holding the staple to the bulkhead were not good or workmanlike welds by any standard; that too many gas inclusions or pockets resulted in an excessive degree of porosity in one or both welds; that one end of the staple was spaced too far from the surface of the bulkhead at time the weld was applied.

There was opinion evidence that with workmanlike welding the staple would have withstood approximately 13 tons; that if properly welded the parent metal would have yielded to strain ahead of the weld. Moreover, the weld was painted, and the defects were not patent. It is conceded that even upon close visual examination, the defects could not have been discovered.

Thus it is clear that libelant's injuries were proximately caused by defective welding of the "pad eye" or "U" bolt in question. There is no evidence that libelant

assumed the risk or that any want of care on his part proximately contributed to his injuries.

Libelant v. United States;
Permanente v. United States;
United States v. Luckenbach

In considering which of the respondents and impleaded-respondents are answerable for libelant's injuries, it seems apparent at the outset that the United States has not consented to be sued under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., because the "Samovar" was not "employed as a merchant vessel." Shewan & Sons v. United States, 1924, 266 U.S. 108, 111, 45 S.Ct. 45, 46, 69 L.Ed. 192; The Western Maid, 1922, 257 U.S. 419, 431, 42 S.Ct. 159, 66 L.Ed. 299; Bradey v. United States, 2 Cir., 1945, 151 F.2d 742, certiorari denied, 1946, 326 U.S. 795, 66 S.Ct. 484, 90 L.Ed. 483; Foster v. Moore-McCormack, 2 Cir., 1942, 131 F.2d 907, 908, certiorari denied, 1943, 318 U.S. 762, 63 S.Ct. 560, 87 L.Ed. 1134. Nor can consent be found under the Public Vessels Act, 46 U.S.C.A. § 781 et seq., since the ship was not a public vessel of the United States at time of libelant's injury. United States v. Caffey, 2 Cir., 1944, 141 F.2d 69, 71, certiorari denied, 1944, 323 U.S. 750, 65 S.Ct. 84, 89 L.Ed. 601.

Statutes waiving sovereign immunity are always strictly construed. United States v. Clyde-Mallory Lines, 5 Cir., 1942, 127 F.2d 569, 571, affirmed 1943, 317 U.S. 395, 63 S.Ct. 294, 87 L.Ed. 355; Eastern Transportation Co. v. United States, 1927, 272 U.S. 675, 686, 47 S.Ct. 289, 71 L.Ed. 472; Blackfeather v. United States, 1903, 190 U.S. 368, 376, 23 S.Ct. 772, 47 L.Ed. 1099. So in the absence of specific authority granted by Congress, this court has no jurisdiction over libelant's claim against the United States Government. Nassau Smelting Works v. United States, 1924, 266 U.S. 101, 106, 45 S.Ct. 25, 69 L.Ed. 190; United States v. Turner, 8 Cir., 1931, 47 F.2d 86, 87.

Nor has the Government consented to be sued in this court on the contract claim asserted by Permanente in its petition to implead the United States, since it does not appear that the amount claimed is less than $10,000, 28 U.S.C.A. § 41(20), or that the issues tendered can be restricted to those between Permanente and the Government. United States v. Sherwood, 1941, 312 U.S. 584, 591, 61 S.Ct. 767, 85 L.Ed. 1058; Lowe v. United States, D.C.N.J. 1941, 37 F.Supp. 817. Consequently any claim over of Permanente under the ship construction contract must be prosecuted in the Court of Claims. 28 U.S.C.A. § 241 et seq.; United States v. Tacoma Oriental S. S. Co., 9 Cir., 1936, 86 F.2d 363, 369.

Moreover, a contract for the construction of a ship is not deemed a maritime contract (Thames Towboat Co. v. The Francis McDonald, 1920, 254 U.S. 242, 244, 41 S.Ct. 65, 65 L.Ed. 245; People's Ferry Co. v. Beers, 1857, 20 How. 393, 61 U.S. 393, 402, 15 L.Ed. 961), and there exists no maritime liability on the part of the United States to libelant which could give maritime character to Permanente's claim over under the contract. United States v. Caffey, supra, 141 F.2d at page 71, certiorari denied, 323 U.S. at 750, 65 S.Ct. 84, 89 L.Ed. 601; Foster v. Moore-McCormack Lines, supra, 131 F.2d at page 908, certiorari denied, 318 U.S. at page 762, 63 S.Ct. 560, 87 L.Ed. 1134. Hence Permanente's claim over against the United States is not properly cognizable in admiralty. Washington-Southern Nav. Co. v. Baltimore Co., 1924, 263 U.S. 629, 635, 44 S.Ct. 220, 68 L.Ed. 480; The Eclipse, 1890, 135 U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269; Home Ins. Co. v. Merchants' Transp. Co., 9 Cir., 1926, 16 F.2d 372; The Yankee, D.C.E.D.N.Y.1941, 37 F.Supp. 512, 514.

Nor may it be said that by impleading Luckenbach and asserting a contingent claim over, the United States has instituted an action and thereby voluntarily submitted all controversies involved to the jurisdiction of this court. Nassau Smelting Works v. United States, supra, 266 U.S. at page 107, 45 S.Ct. 25, 69 L.Ed. 190. Cf. United States v. The Thelka, 1924, 266 U.S. 328, 45 S.Ct. 112, 69 L.Ed. 313; The Siren, 1868, 7 Wall. 152, 74 U.S. 152, 19 L.Ed. 129.

Accordingly, the motion to dismiss the libel as against respondent United States must be granted. So with the motion to dismiss Permanente's petition impleading the United States as third party respondent. The United States being now removed as a party to the proceedings, the motion to dismiss the Government's petition impleading Luckenbach as third party respondent must also be granted.

This leaves libelant's claim for damages pending against Permanente and the British Ministry, both of whom have asserted a claim over against Luckenbach as third party respondent.

Libelant v. Permanente

There is no doubt that the defective weld was a proximate cause of libelant's injuries. This defect resulted from the welder's negligence for which respondent Permanente must answer. But the question remains as to whether Permanente must answer to libelant. That is to say, was there any relationship, either under contract or through general principles of the maritime law of torts, giving rise to any duty of care on the part of Permanente as shipbuilder toward libelant as longshoreman.

The contractual obligation of Permanente was to construct the vessel according to plans and specifications of the Maritime Commission. The welding in question was not in keeping with that obligation. Libelant, however, was not a beneficiary of that contract.

Furthermore, as previously noted, the contract to build the ship was not a maritime contract. So even if libelant were a third-party beneficiary of Permanente's contractual obligation as builder, the breach of that obligation was not maritime in character, and hence not cognizable in admiralty.

It is well established that "Jurisdiction of courts of admiralty, in matters of contract, depends upon the nature and character of the contract; but in torts, it depends entirely on locality." Philadelphia, Wilmington & Baltimore R. Co. v. Philadelphia & Havre de Grace Towboat Co., 1859, 23 How. 209, 64 U.S. 209, 215, 16 L.Ed. 433; The Admiral Peoples, 1935, 295 U.S. 649, 651, 55 S.Ct. 885, 79 L.Ed. 1633; Atlantic Transport Co. v. Imbrovek, 1914, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208, 51 L.R.A.,N.S., 1157. "Locality" is where the substance and consummation of the occurrence which gave rise to the cause of action took place. Minnie v. Port Huron Terminal Co., 1935, 295 U.S. 647, 649, 55 S.Ct. 884, 79 L.Ed. 1631. The general rule is that: "The place of wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place." Restatement, Conflict of Laws (1934) § 377. Thus when, as in the case at bar, a negligent act originates on land but the damage occurs on water, the resulting cause of action is within admiralty jurisdiction. Smith v. Lampe, 6 Cir., 1933, 64 F.2d 201; The America, D.C.E.D.N.Y.1940, 34 F. Supp. 855.

It is also the general rule that the law of the place of injury determines whether a legal injury has been sustained, and the responsibility therefor. So liability for a tort committed on board a vessel of foreign registry while in the territorial waters of a country, is determined by the law of that country. Restatement, Conflict of Laws (1934) §§ 378, 379, 404.

Accordingly, libelant having been injured aboard a vessel flying the flag of Great Britain while in territorial waters of the United States, the general maritime law of this country determines the question of liability. Uravic v. F. Jarka Co., 1931, 282 U.S. 234, 240, 51 S.Ct. 111, 75 L.Ed. 312; Williams v. Oceanic Stevedoring Co., D.C.S.D.Tex.1928, 27 F.2d 905; (1928) 42 Harv.L.Rev. 273. See Cunard S. S. Co. v. Mellon, 1923, 262 U.S. 100, 124, 43 S.Ct. 504, 67 L.Ed. 894, 27 A.L.R. 1306; The Mandu, D.C.E.D.N.Y.1936, 15 F.Supp. 627, 629.

"That we have a maritime law of our own, operative in the United States, cannot be doubted. The general system of maritime law which was familiar to the lawyers and statesmen of the country when the Constitution was adopted, was most certainly intended and referred to when it was declared in that instrument that the judicial power of the United States shall ex-

tend 'to all cases of admiralty and maritime jurisdiction' [Const. art. 3, § 2, cl. 1]." The Lottawanna, 1874, 21 Wall. 558, 88 U.S. 558, 574, 22 L.Ed. 654; Workmen v. City of New York, 1900, 179 U.S. 552, 561, 21 S.Ct. 212, 45 L.Ed. 314. And "in the absence of some controlling statute, the general maritime law, as accepted by the Federal courts, constitutes part of our national law, applicable to matters within the admiralty and maritime jurisdiction." Southern Pacific Co. v. Jensen, 1917, 244 U.S. 205, 215, 37 S.Ct. 524, 528, 61 L.Ed. 1086, L.R.A.1918C, 451, Ann.Cas.1917E, 900.

The general maritime law has achieved change and growth through the judicial process of adoption by courts of admiralty of new rules and principles found in state legislation. Just v. Chambers, 1941, 312 U.S. 383, 388, 668, 61 S.Ct. 687, 85 L.Ed. 903; Western Fuel Co. v. Garcia, 257 U.S. 233, 242, 42 S.Ct. 89, 66 L.Ed. 210; Southern Pacific Co. v. Jensen, supra, 244 U.S. at page 216, 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A.1918C, 451, Ann.Cas.1917E, 900. The J. E. Rumbell, 1892, 148 U.S. 1, 13 S.Ct. 498, 37 L.Ed. 345; The Lottawanna, supra, 21 Wall. at pages 579, 580, 88 U.S. at pages 579, 580, 22 L.Ed. 654.

As stated by the Supreme Court in the latest of these cases: "With respect to maritime torts * * * the State may modify or supplement the maritime law by creating liability which a court of admiralty will recognize and enforce when * * * not hostile to the characteristic features of the maritime law or inconsistent with federal legislation." Just v. Chambers, supra, 312 U.S. at page 388, 61 S.Ct. at page 691, 85 L.Ed. 903.

By the same token, where the common law of a state in whose territorial waters a maritime tort occurs has been modified or supplemented so as to impose on manufacturers or builders a duty of care to persons not "in privity", a court of admiralty should recognize that duty and enforce the liability proximately resulting from a breach thereof, if adoption of the state rule "works no material prejudice to * * * maritime law." Millers' Indemnity Underwriters v. Braud, 1926, 270 U.S. 59, 46 S.Ct. 194, 70 L.Ed. 470.

The rule in California with respect to liability for negligence of manufacturers and builders was stated in Sheward v. Virtue, 1942, 20 Cal.2d 410, 126 P. 2d 345: "The courts of this state are committed to the doctrine that the duty of care exists in the absence of privity of contract not only where the article manufactured is inherently dangerous but also where it is reasonably certain, if negligently manufacturing or constructed, to place life and limb in peril."

The general rule is that: "A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is manufactured." Restatement, Torts (1934) § 395.

Earlier the general rule in this country was that "a contractor, manufacturer, or vendor is not liable to third parties who have no contractual relations with him for negligence in the construction, manufacture, or sale * * *", except in cases where the article was "inherently dangerous" or "intended to preserve, destroy or affect human life" (i. e. drugs and explosives). Huset v. J. I. Case Threshing Machine Co., 8 Cir., 1903, 120 F. 865, 868-870, 61 L.R.A. 303. And the leading authority in support of this rule was an English case, Winterbottom v. Wright, [Ex. 1842], 10 M. & W. 109, where the Court of Exchequer held that in the absence of privity of contract, there could be no recovery for a negligent failure to keep a coach in repair. See Seavey, Mr. Justice Cardozo and the Law of Torts (1939) 39 Col.L.Rev. 20, 24-27; 52 Harv.L.Rev. 372, 376-379; 48 Yale L.J. 390, 394-397.

The early California cases were in accord. Lewis v. Terry, 1896, 111 Cal. 39, 44, 43 P. 398, 399, 31 L.R.A. 220, 52 Am. St.Rep. 146; Cliff v. California Spray Chemical Co., 1927, 83 Cal.App. 424, 430,

257 P. 99, 101; Catlin v. Union Oil Co., 1916, 31 Cal.App. 597, 605, 161 P. 29, 33.

In 1916, Mr. Justice Cardozo, then a Judge of the New York Court of Appeals, in MacPherson v. Buick Motor Co., 1916, 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas.1916C, 440, called attention to the injustice of having liability turn upon the theoretical nature of the article, rather than its actual state or condition. The negligence in the MacPherson case was the failure of an automobile manufacturer to discover a defect in a wheel purchased from another manufacturer. Liability for that negligence was imposed upon the automobile manufacturer in favor of a person other than the buyer.

The rule of the MacPherson case has not been universally followed in this country (Ford v. Sturgis, 1926, 56 App.D.C. 361, 14 F.2d 253, 52 A.L.R. 619), but it has been adopted in whole or in part in most jurisdictions and is now recognized as a landmark in our jurisprudence. Of course it applies to negligent manufacture as well as negligent inspection. Bohlen, Fifty Years of Torts, (1937) 50 Harv.L.Rev. 1225, 1232-1234.

In California the nonliability rule of Winterbottom v. Wright has been supplanted, and the decisions now impose a general noncontractual duty of care upon manufacturers and builders. Escola v. Coca Cola Bottling Co., 1944, 24 Cal.2d 453, 150 P.2d 436; Sheward v. Virtue, supra, 20 Cal.2d at page 410, 126 P.2d at page 345; Stultz v. Benson Lumber Co., 1936, 6 Cal.2d 688, 59 P.2d 100; Kalash v. Los Angeles Ladder Co., 1934, 1 Cal.2d 229, 231, 232, 34 P.2d 481, 482; Dahms v. General Elevator Co., 1932, 214 Cal. 733, 7 P.2d 1013; Cowles v. Independent Elevator Co., 1937, 22 Cal. App.2d 109, 70 P.2d 711.

There can be no doubt that a "cargo lashing ring", when negligently welded, is reasonably certain to place life and limb in peril when used in the manner for which the manufacturer should reasonably expect it to be used. If, then, at the time libelant was injured the "cargo lashing ring" was being used for one of the purposes for which it was intended, it is clear that he would have a cause of action against Permanente under California law.

Although the builder called them "cargo lashing rings", and said they were only to be used to hold cargo in place against motion of the ship at sea, the evidence showed that they were commonly used by longshoremen in "snaking" or "bullying" or "schoonering" cargo into the wings of the vessel. Indeed these "cargo lashing rings" were the only devices or fittings on the bulkheads to which a snatch block could be attached. As the chief officer of the "Samovar" said: "It is the usual practice, it is the only way you can stow them * * *."

Accordingly, I find that at the time of libelant's injury, the stevedoring crew was using the "pad eye" or "cargo lashing ring" for one of the purposes for which it was intended. Since the "U" bolt or staple by which the ring was held to the bulkhead was defectively welded to the surface of the bulkhead, I further find that the device or fitting or equipment in question was unfit and unsuitable for the purpose for which it was intended to be used; unfit and unsuitable even for lashing cargo.

In view of the fact, then, that the injury occurred in territorial waters of California, that libelant was not a seaman but a stevedore employed in California, and the vessel was built in California, it would seem in keeping with precedent for this court of admiralty to follow the law of California imposing liability, even though the imposition be not by legislation. The "subject is maritime and local in character and * * * following the common law, will not * * * prejudice * * * general maritime law * * *." Western Fuel Co. v. Garcia, supra, 257 U.S. at page 242, 42 S.Ct. at page 90, 66 L.Ed. 210.

Moreover it has been held that "in cases of maritime torts it is the rule of the courts of admiralty to exercise 'a conscientious discretion and give or withhold damages upon enlarged principles of justice and equity.'" The Explorer, D.C.E.D. La.1884, 20 F. 135, 139; The Princess Sophia, D.C.W.D.Wash.1929, 35 F.2d 736, 738. Cf. Calmar S. S. Corp. v. Taylor, 1938, 303 U.S. 525, 529, 58 S.Ct. 651, 82 L.Ed. 993.

So when recalling that the non-liability doctrine of Winterbottom v. Wright was an early principle of maritime law, admiralty courts should remember that the doctrine has been renounced by most of the common-law courts of this country, and even in the land of its birth. M'Alister v. Stevenson, (1932) A.C. 562; Grant v. Australian Knitting Mills, (1936) A.C. 85. And the same "enlarged principles of justice and equity" which motivated the common-law courts to impose a broader duty of care upon manufacturers and builders should now control decision in courts of admiralty. Therefore, without reference to California law, courts of admiralty should accept the doctrine of the MacPherson case as a general principle of the corpus maris juris, as administered in this country.

In a recent action at law involving a maritime tort, where the facts were on all-fours with those in the case at bar, the Third Circuit Court of Appeals held that the principles of MacPherson v. Buick Motor Co. had "become so widely accepted as to be construed as a part of the general law of torts, maritime as well as common law." Sieracki v. Seas Shipping Co., 3 Cir., 1945, 149 F.2d 98, 99, 100, affirmed, Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

Although the affirmance involved another issue in the case, as the shipbuilder did not contest the liability imposed in the courts below, there is nothing in the Supreme Court's opinion to indicate that there was any question about the duty of care owed by the shipbuilder to the stevedore. Mr. Chief Justice Stone, in the dissenting opinion, makes the assumption that the plaintiff there not only has a remedy against the shipbuilder who negligently failed to inspect a shackle used in the construction of the ship, but against the furnisher of the defective shackle as well. Seas Shipping Co. v. Sieracki, supra, 328 U.S. at page 107, 66 S.Ct. 872, 90 L.Ed. 1099.

Respondent Permanente, then, owed libelant a general duty of care which was breached by faulty welding of the "cargo lashing ring." Permanente is therefore answerable to libelant in damages for his injuries proximately caused by that negligence.

Libelant v. British Ministry of War Transport

As bareboat charterer of the "Samovar", the relationship and obligation of the British Ministry of War Transport to libelant was that of shipowner. Leary v. United States, 1871, 14 Wall. 607, 81 U.S. 607, 610, 20 L.Ed. 756; Reed v. United States, 1870, 11 Wall. 591, 78 U.S. 591, 600, 20 L.Ed. 220; The Del Norte, 9 Cir., 1902, 119 F. 118, 123; The Dutchess, D.C.E.D. N.Y.1926, 16 F.2d 1003. And the shipowner's warranty of the seaworthiness of the vessel extends to longshoremen as well as seamen. Seas Shipping Co. v. Sieracki, supra, 328 U.S. at page 99, 66 S.Ct. 872, 90 L.Ed. 1099; The Wearpool, 5 Cir., 1940, 112 F.2d 245; Cassil v. United States Emergency Fleet Corp., 9 Cir., 1923, 289 F. 774, 775. Cf. The Mercier, D.C.Or.1933, 5 F.Supp. 511, affirmed, Anderson v. Compagnie, Maritime Belge, 9 Cir., 1934, 72 F.2d 1008.

The British Ministry has not presented any claim of sovereign immunity to suit. Ex Parte Transportes Maritimos do Estado 1924, 264 U.S. 105, 108, 44 S.Ct. 236, 68 L.Ed. 580. Cf. Ex Parte Republic of Peru, 1943, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014.

However, the British Ministry contends that since libelant's injury occurred aboard a ship of British registry, the law of England governs; that by the law of England the owner does not warrant seaworthiness of the vessel to the crew, but only to "use all reasonable means to insure the seaworthiness of the ship" (The Merchant Shipping Act, 1894, 57 and 58 Vict. § 60; Halsbury's Laws of England, 2d Ed., 1931, Vol. 30, p. 208; Abbott's Merchant Ships and Seamen, 14th Ed., 1901, p. 219; that since the British Ministry was not guilty of any negligence, it should not be held liable for any unseaworthiness due to faulty welding by the builder.

This contention is without merit because, as stated before, liability in the case at bar is to be determined by the law of this coun-

try. Uravic v. F. Jarka Co., supra, 282 U.S. at page 234, 51 S.Ct. 111, 75 L.Ed. 312. So the British Ministry must respond if breach of the shipowner's warranty of seaworthiness proximately caused libelant's injuries.

It is urged that there is no evidence of unseaworthiness, "because the 'pad eye' or 'cargo lashing ring' was not properly employed by libelant's crew, and a defect does not constitute unseaworthiness unless the object is unfit and unsuitable for the purpose for which it was intended to be used."

Since I have already found that at the time libelant was injured the "pad eye" or "cargo lashing ring" was being used for one of the purposes for which it was intended, and that it was unfit and unsuitable for that purpose, it follows that there was a breach of the shipowner's warranty of seaworthiness for which the British Ministry must respond. Seas Shipping Co. v. Sieracki, supra, 328 U.S. at pages 95-97, 66 S.Ct. 872, 90 L.Ed. 1099. Mahnich v. Southern S. S. Co., 1944, 321 U.S. 96, 99, 64 S.Ct. 455, 88 L.Ed. 561; The Osceola, 1903, 189 U.S. 158, 173, 23 S.Ct. 483, 47 L.Ed. 760.

The British Ministry v. Permanente

It is next urged that any liability of the British Ministry arising out of the warranty of seaworthiness is at most that of but a "technical" or "passive" tortfeasor; that the primary liability is Permanente's for the negligent welding; that any liability of the British Ministry is due entirely to such negligent welding; hence, as between the British Ministry and Permanente, the latter should be held primarily liable and the former only secondarily liable.

There was no evidence of any negligence on the part of the British Ministry. The defect in the welding was entirely latent. Only Permanente's negligent welder, if any one, knew of it. Nor was the defect discovered prior to painting, although "visual", "hammer" and "hose" tests were made by inspectors for Permanente, the Maritime Commission and others. And the experts said that painting of the fitting prior to completion of the ship would have rendered latent even a theretofore patent defect in the weld.

Hence, neither Permanente nor the British Ministry was negligent in failing to discover the defective weld. However, no amount of careful tests and inspection could relieve Permanente from liability for the negligence of the employee who performed the defective welding, which rendered the ship unseaworthy in the particular involved at bar and was a proximate cause of the libelant's injuries.

Thus Permanente is the primary tortfeasor and the British Ministry the secondary wrongdoer. So Permanente should be required to indemnify the British Ministry for such sums as the latter is required to pay to libelant. Washington Gaslight Co. v. District of Columbia, 1896, 161 U.S. 316, 327, 16 S.Ct. 564, 40 L.Ed. 712; George A. Fuller Co. v. Otis Elevator Co., 1918, 245 U.S. 489, 491, 38 S.Ct. 180, 62 L.Ed. 422; Standard Oil Co. v. Robins Dry Dock, etc., Co., 2 Cir., 1929, 32 F.2d 182, 184, affirming D.C.E.D.N.Y.1928, 25 F.2d 339, 340; Sagadahoc S. S. Corp. v. Seaboard Stevedoring Corp., D.C.N.D.Cal.1928, 26 F.2d 295, affirmed, 9 Cir., 1929, 32 F.2d 886. Cf. Seas Shipping Co. v. Sieracki, supra, 328 U.S. at page 89, 66 S.Ct. 872, 90 L.Ed. 1099.

Permanente and the British Ministry v. Luckenbach

Both Permanente and the British Ministry have impleaded libelant's employer, Luckenbach Steamship Company, pursuant to Admiralty Rule 56, alleging that Luckenbach's negligence proximately contributed to libelant's injuries.

With its answer denying any negligence, Luckenbach has interposed exceptions to these petitions. These exceptions challenge the contention that the British Ministry is a beneficiary of the contract between Luckenbach and the War Shipping Administration, which provides that:

"8. (a) While performing the work the Stevedore [Luckenbach] shall * * * be responsible for any and all loss, damage or injury (including death, wherever used herein) to persons, cargo, vessels * * *

or other property or thing, arising through the *negligence or fault* of the Stevedore, its employees, gear or equipment; provided * * * that the Stevedore shall not be responsible to the Administrator in Washington, D. C., for any such loss, damage or injury resulting from the negligence or wrongful acts of the Administrator or from acts of the Stevedore or its employees performed in compliance with the specific directions of the Administrator or from the fault of ship's or other gear supplied by the Administrator."

The British Ministry's contention is not well founded for two reasons: first, the agreement was not made for the benefit of any third person; and, second, libelant's injuries here resulted "from the fault of ship's * * * gear * * *." Thus there is no right of contribution between Luckenbach and the British Ministry by reason of the former's contract with the War Shipping Administration; and Luckenbach's exception upon that ground will be sustained.

It is therefore unnecessary to consider the added exception, that even if the contract were for the benefit of the British Ministry, Luckenbach would be discharged as indemnitor because of the British Ministry's failure to assert the defense of sovereign immunity.

Luckenbach also excepts to the petitions of both Permanente and the British Ministry upon the grounds: (1) that inasmuch as libelant's right against Luckenbach is governed solely by the Longshoremen's and Harbor Worker's Compensation Act, 33 U.S.C.A. § 901 et seq., the employer's liability is several and not subject to contribution as to any tort-feasor; and (2) that even assuming negligence of Luckenbach was a proximate cause of libelant's injuries, there is no right of contribution because petitioners and Luckenbach are not joint wrongdoers and there is no contract imposing liability over.

Exceptions based upon the second ground will be overruled, since if negligence of Luckenbach was a proximate cause of libelant's injuries, both Permanente and the British Ministry are entitled to contribution from Luckenbach by well-established rules of maritime law. Aktieselskabet Cuzco v. The Sucarseco, 1935, 294 U.S. 394, 400, 401, 55 S.Ct. 467, 79 L.Ed. 942; Erie R. R. Co. v. Erie & Western Transp. Co., 1907, 204 U.S. 220, 225, 27 S.Ct. 246, 51 L.Ed. 450; The Chattahoochee, 1899, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801; Briggs v. Day, D.C.S.D.N.Y.1884, 21 F. 727, 730.

Exceptions made upon the ground first stated will also be overruled, because the Longshoremen's and Harbor Workers' Compensation Act alters only the liability of the employer to the employee (Seas Shipping Co. v. Sieracki, supra, 328 U.S. at page 102, 66 S.Ct. 872, 90 L.Ed. 1099), and does not affect the conventional relationship between the employer and other tort-feasors. Barbarino v. Stanhope S. S. Co., 2 Cir., 1945, 151 F.2d 553, 555; The Tampico, D.C.W.D.N.Y.1942, 45 F.Supp. 174, 175; Cataldo v. A/S Glittre, D.C.E.D. N.Y.1941, 41 F.Supp. 555, 557; Rederii v. Jarka Corp., D.C.Me.1939, 26 F.Supp. 304, 305. Cf. Porello v. United States, 2 Cir., 1946, 153 F.2d 605, 607, affirmed in part and reversed in part, American Stevedores v. Porello, 330 U.S. 446, 67 S.Ct. 847.

Luckenbach relies upon the case last cited in which the Second Circuit Court of Appeals stated that, inasmuch as a longshoreman's only remedy against his employer is under the Longshoremen's and Harbor Workers' Compensation Act, the employer's liability is several and a third party tort-feasor held liable to the longshoreman is not entitled to contribution from the employer. Porello v. United States, supra, 153 F.2d at page 607.

However, in holding the United States liable as shipowner, the Circuit Court granted full indemnity against the employer by reason of a contract between the parties. The Supreme Court reversed that portion of the decree which granted indemnity and remanded the question to the district court. American Stevedores v. Porello, supra, 330 U.S. at page —, 67 S. Ct. 847. Moreover, in denying the petition of the employer for a rehearing, the Circuit Court said that since the indemnity award was based upon contract, the question of contribution was to be considered as

left open. Porello v. United States, supra, 153 F.2d at page 609. Accordingly, I do not consider this decision as precedent in support of Luckenbach's exception here.

It is a settled principle of maritime law that tort-feasors are jointly and severally liable. Aktieselskabet Cuzco v. The Sucarseco, supra, 294 U.S. at pages 400, 401, 55 S.Ct. 467, 79 L.Ed. 942; The Chattahoochee, supra, 173 U.S. at page 540, 19 S.Ct. 491, 43 L.Ed. 801; The Atlas, 1876, 3 Otto 302, 93 U.S. 302, 315, 23 L.Ed. 863; The Alabama, 1875, 2 Otto 695, 92 U.S. 695, 697, 698, 23 L.Ed. 763; The Washington, 1869, 9 Wall. 513, 76 U.S. 513, 516, 19 L.Ed. 787. Where the parties are before the court, the decree can be formulated so as to direct each to pay his "moiety of the damages" (The Atlas, supra, 3 Otto at page 315, 93 U.S. at page 315, 23 L.Ed. 863; The Alabama, supra, 2 Otto at pages 697, 698, 92 U.S. at pages 697, 698, 23 L.Ed. 763. See American Stevedores v. Porello, supra, 330 U.S. at page —, 67 S.Ct. 847), with a right reserved to libelant to collect the entire amount from either of them in case of the inability of the other to respond for his part. The Washington, supra, 9 Wall. at page 516, 76 U.S. at page 516, 19 L.Ed. 787.

If, by reason of limitation of liability or other statutory immunity, a libelant cannot recover directly from one of two joint tort-feasors, he may proceed against one for the full amount of his damages, and the latter would have a right of contribution for one-half from the other tort-feasor. Aktieselskabet Cuzco v. The Sucarseco, supra, 294 U.S. at pages 400, 401, 55 S.Ct. 467, 79 L.Ed. 942; The Chattahoochee, supra, 173 U.S. at page 540, 19 S.Ct. 491, 43 L.Ed. 801. This right of contribution may even be enforced by a separate libel in admiralty after a decree in the original action. Erie R. R. Co. v. Erie & Western Transp. Co., supra, 204 U.S. at page 225, 27 S.Ct. 246, 51 L.Ed. 450.

As Judge Peters said in Rederii v. Jarka Corp., supra, 26 F.Supp. at page 305: "If the longshoreman's right of action against the vessel was not taken away by the Act (Longshoremen's and Harbor Workers' Compensation Act) he can libel the vessel as before, and an owner of the vessel who is obliged to pay damages has the same rights and remedies against other persons as he had before the Act was passed."

In the case at bar, then, the right of Permanente and the British Ministry to receive contribution from Luckenbach, if negligent, is not defeated by reason of the fact that Luckenbach's liability to libelant is limited to the remedy provided by the Compensation Act.

Furthermore, I must find from the evidence that Luckenbach's negligence was a proximate cause of libelant's injuries. The cases of cargo being stowed by the stevedoring gang of which libelant was a member each weighed 11,075 pounds. That weight was stamped on the cases, and is approximately 100 pounds under the weight limit for conventional gear. Libelant's foreman discussed this weight problem with the walking boss, and testified that if the cases had been 250 pounds heavier, he would have doubled up the falls in lowering them into the hold in order to relieve the stress on the booms. As the case involved here was being moved from the square of the hatch into the starboard after wing, the foreman himself rode on top of the moving case, adding his weight.

Both the foreman and libelant testified that dunnage was used for skids and that only two skids had been placed under the case. Luckenbach's own witness, Safety Engineer of the Accident Prevention Bureau of the Waterfront Employers of the Pacific Coast, testifying as to practices in stevedoring considered safe and proper, said: "They usually slide the case butt end in, and it is generally prescribed as three skids to move the heavy cases" in general stevedoring operations.

The foreman admitted that he "had the one snatch block in the sling a little too far aft"; that the snatch block on the starboard side should have been "about two feet further forward." Consequently, as the case moved, the forward end was thrown around toward the starboard afterend of the hold.

In the words of the foreman: "As soon as it started to move I could see it was trying to move crooked * * * the case

had been moved about five feet and was still moving * * * it started to go crooked, and that was when I hollered for it to stop * * * Mr. Lascovich was my keyman, and he was acting as a signalman * * * He took directions from me * * * I told him to get all the men in the clear * * * out of the throw of the block."

Libelant testified that when the case started to "move in the wrong direction", the foreman signaled him and he in turn signaled the winches "to put a little more power on the yard arm boom." Instead of stopping the winches and moving the starboard beam clamp and gear two feet forward, the foreman attempted to correct the course of the gradually sliding case by applying "a little more power on the yard arm boom." The yard arm or port boom "was tied with a bullrope on the pad eye."

For the winch driver to see the signal which the foreman instructed libelant to give, it was necessary for him to step "from this place of safety, which was behind the stanchion, out into the open where he was struck by the throw of the line and the block."

The foreman failed to use due care in the circumstances. His negligence was also Luckenbach's negligence, and it proximately contributed to libelant's injuries. Accordingly, Permanente and the British Ministry have a several right to receive contribution from Luckenbach as a joint tort-feasor to the extent of one-half of libelant's recovery in this cause.

Libelant's Damages

There remains to consider the issue as to the amount of damages. Libelant was 49 at the time he was injured aboard the Samovar, and had worked as a longshoreman for more than 20 years. Libelant was rendered unconscious by the blow he received when the "pad eye" with snatch block and gear carried away and struck him down.

The blow struck libelant on the right side of his forehead. Apparently due to raising his right arm in a vain effort to ward off the blow, libelant suffered a complete oblique fracture of the upper third of the right ulna with angulation. But his most serious injury was a longitudinal fracture of the skull extending entirely through the right frontal bone—a complete linear fracture through the whole thickness of the bone, running approximately 5 inches from the beginning of the frontal bone up to the top of the skull.

Libelant was unable to return to work until four months after he was injured. Since his earnings during the preceding year averaged $300 per month, libelant's loss of earnings for the four-month period amounted to $1,200. The medical expenses, paid by Luckenbach, amounted to $342.16.

Following return to work on December 6, 1943, libelant worked as foreman of a stevedoring gang until July 10, 1944, on which date he was injured aboard the S. S. Sea Star when a hatch boom broke and "the block swung over the hatch and hit me in the eye." This second injury resulted in the enucletion of libelant's right eye, and absence from work for six months.

Medical opinion holds that libelant today is suffering from a traumatic head syndrome—a group of concurrent symptoms following concussion or injury to the brain. Among the symptoms are "dizziness, fatigue-ability, headache, ringing in the ears, irritability." The added opinion expressed at the trial was that, considering libelant's present age, physical condition, and the length of time since the accident, there is scant reason to expect "any further improvement in his condition."

Respondents point to the fact that libelant actually increased his earning rate between the injury aboard the Samovar and that aboard the Sea Star; that libelant lost only four months following the former injury and six months following the latter; that libelant's earning power did not show any decline until after the latter injury.

While statistically impressive, these facts do not give a true picture. Libelant returned to work so soon following the first injury because of the war and the pressing need for longshoremen. These factors also explain libelant's increased earnings between the first accident and the second.

The evidence is not as satisfactory as I wish it were in quest of certainty as to precisely which of libelant's present disabilities

were proximately caused by the injury suffered aboard the Samovar, independently of the injuries proximately resulting from the later accident aboard the Sea Star. However, I am satisfied that the fracture of libelant's skull aboard the Samovar was of such severity as to cause him great pain and suffering. I am also satisfied, as one medical expert put it, considering the thickness of the skull at the place of fracture and the underlying brain tissues, when there is sufficient force to have broken the skull in that region "there is bound to be injury to the soft tissues." Accordingly, I find that more than half of libelant's present disabilities resulting from the two accidents proximately resulted from the injuries sustained aboard the Samovar on August 5, 1943.

By reason of his injuries received aboard the Samovar I find that libelant has sustained general damages of $12,000, and special damages of $1,200 for loss of work, and $342.16 for medical expenses.

Since there was no negligence on the part of libelant proximately contributing toward his injuries, there is no occasion to divide the damages. The Max Morris, 1890, 137 U.S. 1, 15, 11 S.Ct. 29, 34 L.Ed. 586; The Steam Dredge No. 1, 1 Cir., 1904, 134 F. 161, 168, 69 L.R.A. 293; The Henry S. Grove, D.C.Md.1927, 22 F.2d 444, 447.

A decree will be entered as follows:

(1) In favor of libelant and against Permanente and the British Ministry for the sum of $12,000 general damages and $1,542.16 special damages, and the libelant's costs;

(2) The decree will award to Luckenbach a lien upon libelant's recovery in the hands of Permanente and the British Ministry to the extent of $817.16, as reimbursement for compensation payments amounting to $475 and medical benefits amounting to $342.16 received by libelant from Luckenbach pursuant to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq.;

(3) The decree will declare Permanente primarily liable and the British Ministry secondarily liable for the sum awarded libelant;

(4) The libel will be dismissed as against the United States; the petition of Permanente impleading the United States will be dismissed; and the petition of the United States impleading Luckenbach will be dismissed; and

(5) The decree will declare the several right of Permanente and the British Ministry to receive contribution from Luckenbach as a joint tort-feasor to the extent of one-half of libelant's recovery in this cause. The decree will further declare the right of Luckenbach to set-off against any claim for contribution by Permanente or the British Ministry a sum equal to the amount of Luckenbach's aforementioned lien of $817.16 upon libelant's recovery herein; and shall also declare the several right of Permanente and the British Ministry to apply a sum equal to the amount of said lien toward satisfaction of any claim for contribution from Luckenbach.

Proctors for the British Ministry of War Transport will present findings of fact, conclusions of law and decree for approval pursuant to local rule 5 within 20 days.